IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-8037
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID LAMAR FAULKNER, SPENCER H. BLAIN, JR.,
JAMES L. TOLER and ARTHUR FORMANN,

Defendants-Appellants.

_____

Appeals from the United States District Court for
the Western District of Texas
_____

(March 18, 1994)

Before REAVLEY and DAVIS, Circuit Judges and TRIMBLE[*], District
Judge.

REAVLEY, Circuit Judge:

Appellants David Faulkner, James Toler, Spencer Blain, Jr.,
and Arthur Formann appeal their convictions on various counts
arising out of the collapse of several savings and loan
institutions, the funds of which were exhausted in the
development of condominium projects along what is commonly known
as the I-30 corridor in the Dallas area.  We reverse a few of the
wire fraud convictions but otherwise affirm the district court.

_____

[*]    District Judge of the Western District of Louisiana,
sitting by designation.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual Background*

All of the appellants, directly or by adoption of each other's arguments, challenge the sufficiency of the evidence to support their convictions.  "In deciding the sufficiency of the evidence, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt."  *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir.), *cert. denied*, 112 S.Ct. 2952 (1992).  Viewing the evidence in a light most favorable to the government, appellants engaged in a scheme during 1982 and 1983 to enrich themselves and others by well over $100 million through the device of fraudulent real estate loans from savings and loan institutions.  The scheme involved and indeed required the efforts of numerous participants who served separate roles.  Real estate developers would purchase land for condominium development.  The properties would then undergo one or more "land flips" at inflated prices.  "Syndicators" would locate investors to purchase subdivided tracts at the end of the land flip transactions.  The initial and intermediate purchasers would receive huge sums of money in the form of profits from land sales, "commissions" or other fees.  Appraisers would submit false appraisals to support the prices and loans for the properties.  Lenders who controlled savings and loan institutions would provide loans for the sales and resales of the properties.

2

In the scheme Faulkner and Toler served as real estate developers, Blain as one of the inside loan officers, and Formann as one of the appraisers.

In the late 1970's Faulkner, a real estate developer, purchased a tract of land off Interstate 30 near Dallas. He built condominiums in several phases on the property, which he called Faulkner Point. In the early 1980's Faulkner, Toler, Blain, Formann and others became involved in the purchase and sale of numerous other properties in this area, known as the I-30 corridor. Faulkner and Toler, another real estate developer, became partners on deals in the I-30 corridor. They would buy large pieces of land outright or on option, which were ultimately sold to "investors," "builder-investors" or "builder-developers" at inflated prices in a series of land flips in which the property changed hands several times, often on the same day.

Faulkner and Toler would subdivide the tracts they purchased and sell them at a large profit. The properties were sometimes sold to intermediate buyers, who would in turn sell the properties to the investors at even higher prices. Toler and Faulkner would sometimes locate buyers for their properties and arrange financing for the buyers with lenders.

Clifton Sinclair, who was indicted in another proceeding and pleaded guilty to certain counts related to the I-30 debacle, was a key witness for the government. He served a number of roles. He served as a "syndicator" of sorts, by locating investors and offering a package deal to them. He would find a group of

3

investors, prepare loan packages for them which he would submit to lenders, and otherwise offer them an essentially passive investment, by offering to arrange or oversee the financing, construction and marketing of condominiums to be built on the various properties. He or one of his companies was sometimes an intermediate seller in the land flips. Other intermediate purchasers included appraiser Paul Tannehill, Blain, and the principal condominium builder in the area, Wailen York. Sinclair earned millions of dollars from commissions he received at closings and profits as an intermediate seller of properties. Sinclair testified that Faulkner and Toler arranged for financing of the sale of the properties they owned, and had control over the price that they would receive and the commissions and other payments that would be distributed at closing. Commissions regularly went to Brenda Kennedy, a close friend of Faulkner, despite a lack of any apparent effort on her part. Faulkner similarly directed commissions to Kenneth Cansler. Faulkner and Toler would dictate the price they were to receive, and appraisals, loan amounts, and closing costs such as commissions were adjusted or "worked in reverse" to support this price. Sinclair did business through a number of companies he controlled, including Kitco Management Company (Kitco). Ernie Hughes played a syndicator role in the scheme similar to that of Sinclair's. He would locate investors for properties owned by Faulkner or Toler earlier in the chain of title. He too pleaded

guilty to certain offenses in an earlier proceeding and testified for the government.

The money for all of these promotions and investments was always forthcoming from appellant Blain or some other lender designated by Faulkner. Sinclair testified that he tried to do deals without Faulkner and Toler, but was unable to obtain financing. Blain and other savings and loan officers financed both the land and construction loans required for these land flips. Blain became chairman and chief executive officer of Empire Savings and Loan (Empire) in early 1982. He individually approved all of Empire's loans for these transactions. He purchased a majority of Empire's stock with the help of a loan from Faulkner and Toler. Blain had a 25 percent profits interest in Statewide Service Corporation, a subsidiary of Empire. On several occasions Statewide was an intermediate seller in a land flip. Blain paid off his loan to Faulkner and Toler with the proceeds of a loan that was also used to purchase property from Toler known as Chalet Ridge.[1] Toler assisted Blain in obtaining the loan to purchase Chalet Ridge. Blain purchased Chalet Ridge in August and September of 1982 for $686,000. In February of 1983, Blain sold Chalet Ridge to Sinclair for $14.9 million.[2]

---

[1] Blain purchased Chalet Ridge in separate sales of three tracts. One tract went from LATO (a Toler company) to Statewide to Blain; a second from KETO (another Toler company) to Kitco to Toler to a Faulkner/Toler joint venture to Blain; the third tract was transferred via a contract assignment from Toler to Blain.

[2] The exact amount Blain received is unclear. Sinclair testified that the figure was actually $16.1 million

Blain also received a house in Colorado as additional consideration for Chalet Ridge. Blain had made no improvements on the Chalet Ridge property and had attempted unsuccessfully to rezone the property. According to Sinclair, Toler and Faulkner were involved in deciding how much to pay Blain for the property. The government contends that Chalet Ridge was Blain's big payday for providing some of the loans that fueled the land flips. The money to pay Blain came in part from an Empire loan to Sinclair to purchase another property from Faulkner and Toler known as Kirby Mills. Sinclair testified that the "whole purpose of Kirby Mills" was "a vehicle to generate funds for Mr. Blain." On another land transaction Blain received from Sinclair, at Faulkner's direction, a $1.4 million "consulting fee" for no apparent effort. Blain received other questionable payments as well. Empire funded over $100 million in I-30 corridor land and construction loans.

Paul Jensen gained control or influence over two other savings and loans, Lancaster Federal Savings and Loan Association (Lancaster) and Bell Federal Savings and Loan Association (Bell). He personally received millions of dollars in commissions and other payments for arranging loans on the I-30 properties. Sinclair purchased a $4 million mansion for Jensen. Lancaster and Bell funded over $100 million in I-30 corridor loans.

The lending institutions were able to provide funding for the I-30 loans with the help of "brokered deposits." By offering a competitive rate on certificates of deposit, brokers would wire

large deposits to the institutions from depositors nationwide. From the depositors' point of view, the deposits were safe regardless of the health of the institution, since they were insured by the government.

The loans which fueled the land flips did not require investors to put any money down, but instead financed 100% of the purchase price, future interest payments for some period, a "development reserve" to the lender, and "up-front" money or "kickbacks" for the investors at closing. On many occasions Sinclair and Hughes would assist the investors in preparing fraudulent financial statements, tax returns and employment verifications that were submitted to the lenders. The promise of up-front money, usually in the thousands or tens of thousands of dollars, was a key incentive to the investors. On the various loans Empire made it performed no analysis of the appraisals, financial statements, or other documents which lenders typically review. Appraisals and other underwriting materials either were not provided or were simply filed away without any serious review or study.

Formann and others provided inflated appraisals to support the larger and larger loans and the escalating land prices. Appraisals are needed to justify the price of the property to the lender, regulators and buyer. Appraisals were also used to inflate the buyers' financial statements, which would sometimes list as an asset the difference between the price paid or to be paid for a piece of property and the appraised value of the

property.  Larry Hutson, another appraiser of the I-30 properties who sometimes served as a "review appraiser" for Formann, testified that he would receive a value per square foot for the properties from Faulkner, Toler, Empire, Kitco or Hughes and would fabricate an appraisal to reach these values.  One method used to fabricate the appraisals was to use inflated properties on other I-30 deals as comparable sales.

Faulkner, Toler and others were able to perpetuate the scheme for approximately two years by fostering the impression that there was great demand for condominiums in the I-30 corridor, and that every project built was successful.  When some of the builder-developers became concerned about the viability of the projects or the huge loans they were facing, Faulkner and others made arrangements to buy them out at a profit.  Faulkner and Toler also hosted regular breakfasts at a local restaurant to promote the scheme.  As many as 200 people would attend these meetings, which were described as pep rallies. Faulkner and his sales staff gave the impression that condominium sales were brisk.  Many of the condominiums were not sold to purchasers in arms-length transactions.  For example, Faulkner purchased numerous units himself.  Other units went to Jensen, Faulkner's son, the fiancee of Faulkner's son, Wailen York, York's son, Brenda Kennedy, Ernie Hughes, Faulkner's title company closer Jane Nix and others who were not arms-length purchasers.  In reality, demand from arms-length purchasers for the condominiums

8

was low and far from justifying the land prices, loans and construction seen in the area.

Blain and other savings and loan officers, including Paul Jensen and Tommy Nelson, made the whole scheme possible by agreeing to make the necessary loans.  They financed new, larger loans on projects that had not sold and loans so seriously overvalued that no project could succeed.  They charged high points and development reserves on loans that then made their institutions appear healthy.[3]  They participated in land transactions designed to earn them personal profits.  Loans in default or otherwise unlikely to be repaid were renewed.  Land acquisition loans were simply "taken out" by even larger construction loans.  Borrowers never came out of pocket to make interest payments.  Interest payments, if made at all, came from loans provided by the lending institutions.

Federal regulators eventually shut down the savings and loan institutions, which suffered loan losses in the hundreds of millions of dollars.  Most of the properties went into foreclosure.  Faulkner, Toler, Blain, Sinclair and Jensen made tens of millions of dollars from the scheme.  In 1984 Empire was shut down by the FSLIC.  Ultimately, five savings and loans with loans connected to the I-30 corridor failed and depositors were made whole by courtesy of the American taxpayer.  According to the government, Empire alone had over $300 million in bad loans.

---

[3]     For example, Empire would "charge" twelve points for a loan -- a twelve percent loan origination fee of sorts, include the points in the overall loan, and treat the points as income.

The scheme was simple in concept, though complex in its execution. It bore certain similarities to a classic Ponzi scheme. The two initial participants at the top of the pyramid -- Faulkner and Toler -- would buy land and earn large profits by selling to intermediate purchasers. The intermediate purchasers -- Sinclair, Blain, Statewide and other individuals and companies -- likewise profited by selling to large numbers of "investors." The investors, too, profited in the short run, by walking out of closings with up-front money, although they signed large notes or guaranties they could not repay. The lenders supplied the money for all these loans. Ultimately the taxpayers were unceremoniously lodged at the bottom of this pyramid, and had to pay huge sums to insured depositors when the lending institutions failed.

B.   *Procedural History*

The original 88-count indictment was brought in 1987 against the four appellants as well as Paul Jensen, Kenneth Cansler and Paul Tannehill. Count 1 of the indictment is a broad conspiracy count against all seven defendants under 18 U.S.C. § 371. Count 88 is a RICO conspiracy count against Faulkner, Toler, Blain, Jensen and Cansler, brought under 18 U.S.C. § 1962(d). The remaining counts are substantive offense and aiding and abetting counts brought against one or more defendants under various criminal statutes.

The indictment was brought in the Dallas division of the Northern District of Texas. The case was tried to a jury in the

10

Lubbock division of this district, and a mistrial was declared due to a hung jury. The case was transferred back to the Dallas division after the mistrial. The case was called to trial in June of 1991 in Judge Buchmeyer's court, but after several days of voir dire, the court dismissed the panel due to concern about the effect of pretrial publicity. Later that month, the court granted all of the pending motions to transfer venue, which had been filed by Faulkner, Toler, Blain and Formann. The case was transferred to Judge Bunton in the El Paso division of the Western District of Texas. After this transfer, Judge Bunton announced sua sponte that he was transferring the case to the Midland division of the Western District. The case proceeded to trial in September of 1991, and all four defendants were convicted on some counts. Faulkner, Toler and Blain received twenty-year sentences, and Formann received a ten-year sentence. The court also imposed fines against Faulkner and Toler, and pursuant to 18 U.S.C. § 1963(a)(1), entered RICO forfeiture judgments against Faulkner, Toler and Blain, for $40 million, $38 million, and $22 million respectively.

## DISCUSSION OF POINTS OF ERROR

A. *Denial of Blain's Request to Withdraw Motion to Transfer Venue*

On June 26, 1991, Judge Buchmeyer in Dallas held a pretrial conference to consider pending motions. At the time, the four appellants all had pending motions to transfer venue on grounds of pretrial publicity. Based on its efforts to select a jury earlier in the month, the court initially indicated that Faulkner

would be unable to receive a fair trial in Dallas.[4] During a brief recess that followed, Blain instructed his counsel to withdraw his motion to transfer venue. When the recess ended and court reconvened, the court announced that it was granting all the venue motions, and transferring the case to El Paso. Blain's counsel immediately informed the court that he wished to withdraw Blain's venue motion. This request was denied, as was a later written motion to reconsider the denial of the request to withdraw the venue motion. Blain complains that the district court erred in denying his request to withdraw the venue motion.

In its order denying the motion to reconsider, the court noted that it could not transfer those defendants (Tannehill and Cansler) who had not moved for a change of venue. The order then explains that granting the motion would have (1) further fragmented the government's case against the defendants, (2) permitted Blain to avoid trial for another long period of time, and (3) perhaps led to even further delays since "Blain would certainly file a motion to have the charges against him severed from those against defendant Jensen." The order further states that the request to withdraw the venue motion that had been on file for months "is nothing but `posturing,' designed to obtain further delay and some perceived strategical advantages in avoiding a prompt trial in the Western District of Texas."

---

[4] The court stated that "I feel very strongly that I could get a jury here in Dallas as to every Defendant except Mr. Faulkner. I think the recognition factor of Mr. Faulkner is what caused a problem with a jury panel."

12

Finally, the district court noted the defendants had not made any claim that publicity concerning the case would prevent a fair trial in El Paso.

Whether to vacate an order transferring venue is left to the district court's sound discretion. *United States v. Marcello*, 423 F.2d 993, 1005 (5th Cir.), *cert. denied*, 398 U.S. 959 (1970). We find no abuse of discretion. The district court correctly noted that venue could not be transferred as to those defendants who had not requested a transfer, since those defendant's had a Sixth Amendment right to be tried in the Northern District of Texas. *United States v. Stratton*, 649 F.2d 1066, 1076 (5th Cir. 1981). The district court was well aware that the case was over three years old at the time and that the first trial in Lubbock had lasted for months, and it was properly concerned about further delays in the proceedings and further unnecessary fragmenting of the government's case. At the June 1991 hearing counsel for Blain had indicated that he did not want Blain tried with Jensen, and that he preferred a transfer of venue to a trial in Dallas with Jensen.[5] The court further had reason to question whether the request to withdraw the venue motion was motivated out of a genuine concern for the fairness of the venue, or was

---

[5] At one point in the hearing prior to the recess counsel for Blain had stated: "Do we have an option to stay here and get tried with the good Dr. Jensen or go to El Paso and get tried with Danny [Faulkner]? . . . . I don't want to be tried with [Jensen]. He's a banker. . . . [I]f we have a choice of staying here without [Jensen], as opposed to going to El Paso, I would have to think about that one. If I have to stay here with [Jensen] I don't have to think very long. That's our position."

13

instead a mere strategic ploy. At the hearing counsel gave, as his reason for his request to withdraw the motion, his belief that staying in Dallas would facilitate a plea bargain.[6] The court was entitled to ignore such tactical reasons for withdrawing the venue motion.[7]

B.   *The Intradistrict Transfer to Midland*

Faulkner and Toler complain of Judge Bunton's intradistrict transfer of the case from El Paso to Midland. The court ordered the transfer sua sponte at a pretrial conference where no court reporter was present.[8] While his lawyer was not present at the hearing, Faulkner contends that he was present and objected pro se to the transfer.

Under FED. R. CRIM. P. 18, the district court "shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice." We have held that in considering an intradistrict transfer, "the trial court must balance the statutory factors of the convenience of the defendant and

---

[6]   Counsel stated: "My thought is if the case in El Paso is tried win or lose the Government -- this case will not get tried, that they will make -- the Government will make offers once they're stuck with all the folks here in Dallas, that probably everybody is going to accept."

[7]   *Compare Marcello*, 423 F.2d at 1004 ("The Judge was entitled, indeed required, to take [Defendant's] claim [for venue transfer] as presented and proved. His duty was to act and having acted it was not for the Defendant to reweigh the strategic or tactical disadvantages of the victory.").

[8]   The government contends that Judge Bunton transferred the case to Midland to be closer to his home in Odessa.

14

witnesses and the prompt administration of justice." *United States v. Dickie*, 775 F.2d 607, 610 (5th Cir. 1985).  Faulkner and Toler complain that the trial court failed to perform this balancing test.  Faulkner emphasizes that venue is more than a mere procedural matter, and involves issues of constitutional dimension.  He argues that Judge Buchmeyer specifically transferred the case to El Paso and rejected the suggested venue of Midland because it was "within the zone of prejudicial publicity."  The "I-30 scandal" was unquestionably the subject of enormous publicity in Dallas.[9]

We first determine the extent to which Faulkner and Toler preserved error on this point.  While Faulkner asserts that he personally objected to the intradistrict transfer, there is nothing in the record preserving an objection to the transfer by either Faulkner or Toler.  The government does not agree that such an objection was made, and contends that this issue is raised for the first time on appeal and was not properly preserved for review. Indeed, the only indication in the record of the defendants' view of the transfer we can find is a

_____

[9]      According to Toler, the exhibits to his and Faulkner's joint motion to transfer venue filed in Dallas included an index to 1100 newspaper articles concerning I-30, a 1990 survey showing that over 90% of Dallas residents were aware of the case and 60% admitted to an opinion that the defendants were probably or definitely guilty, a videotape of the Phil Donahue show filmed in Dallas during which the mention of Faulkner's name brought a chorus of "boos," and an Ann Richards campaign advertisement from the 1990 gubernatorial race in which she sought votes by linking her opponent to Faulkner.  Toler contends, perhaps without exaggeration, that the "I-30 scandal" received more media attention in Dallas than any event since the Kennedy assassination.

newspaper article attached to a filing by Toler requesting close questioning of jurors regarding pretrial publicity. The article states that Faulkner's attorney "expressed satisfaction Monday over the trial's relocation" to Midland, and quotes him as stating that "[w]e have the potential for a fair trial in Midland that we would have been denied in Dallas." Faulkner and Toler were represented by extremely able counsel with virtually unlimited opportunities to file motions or otherwise preserve their objections to action taken by the trial judge. Under these circumstances we hold that they did not preserve error on this point.

Asserted errors as to which a proper objection has not been raised in the district court can only be reviewed for plain error under FED. R. CRIM. P. 52(b). *United States v. Iwegbu*, 6 F.3d 272, 274-75 (5th Cir. 1993). As we recently held in *Iwegbu*, (1) plain error should be corrected if failing to do so would "seriously affect the fairness, integrity or public reputation of judicial proceedings," (2) a claim of plain error is reviewed against the entire record, and (3) the defendant bears the burden of establishing that the error "had an unfair prejudicial impact on the jury's deliberations." *Id*.

We conclude that the error, if any, in transferring the case from El Paso to Midland does not rise to the level of plain error. While we agree that venue generally is a constitutional

16

concern,[10] and that "errors of constitutional magnitude will be noticed more freely under the plain error rule than less serious errors,"[11] we find it equally clear that the place assigned for trial within a judicial district is not a matter of constitutional dimension.[12]

We further do not agree that Judge Buchmeyer found Midland to be an inappropriate venue because it was within the "zone of prejudicial publicity." The record does not reflect such a finding. At the June 26, 1991 pretrial hearing he indicated that he had checked with Judge Bunton and another judge, and had agreed with Judge Bunton "that El Paso would be the best place for the case to be tried." This conclusion was based on a number of considerations, including courtroom availability, travel time and pretrial publicity. Read in the context of the entirety of its comments, the court did not make a specific finding that

---

[10] Article III of the Constitution provides that criminal trials "shall be held in the State where the said Crimes shall have been committed . . . ." U.S. CONST. art. III, § 3, cl. 2. The Sixth Amendment further provides that criminal defendants have the right to trial "by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

[11] *United States v. Brown*, 555 F.2d 407, 420 (5th Cir. 1977), *cert. denied*, 435 U.S. 904 (1978).

[12] *United States v. Alvarado*, 647 F.2d 537, 539 (5th Cir. 1981) ("In criminal actions, the constitutional unit of venue is the district, not the division."); *United States v. James*, 528 F.2d 999, 1021 (5th Cir.) ("The venue provision of the Sixth Amendment provides only for trial in the *district* where the crime shall have been committed. There is no reference to a division within a judicial district."), *cert. denied*, 429 U.S. 959 (1976); *Bostick v. United States*, 400 F.2d 449, 452 (5th Cir. 1968) ("[T]he division has no constitutional significance; the vicinage is the district."), *cert. denied*, 393 U.S. 1068 (1969).

17

Midland would be an inappropriate venue because it was too close to Dallas and "within the zone of prejudicial publicity."[13] Later in the hearing counsel for the government suggested that the trial be moved to Midland. The court responded that "I've already made my ruling on El Paso. If you want to make a motion for Judge Bunton then you can do so and let him decide that." In

---

[13]    The court stated at the hearing: "Now, I have explored with the Chief Judge Clark of the 5th Circuit and with Lucius Bunton, Chief Judge of the Western District as to alternatives. There is no Judge available in New Orleans that could take the case. I mentioned to the attorneys that I have some personal commitments, and I've done further work on those and those personal commitments would simply preclude me from going to New Orleans for an extended period of time. If I went I would be subjecting the parties to a risk that I may have to pick up and not be able to stay and that would be another problem. So I couldn't take the risk. Chief Judge Clark did not even consider New Orleans as a possibility. He has contacted the Chief Judge of the -- one of the districts in Mississippi and there is an indication that they would have someone available, but it would be substantial period of time off. It would be like next year. I had much better luck with Judge Bunton. Judge Bunton is willing to try the case. He can clear his docket and he would be ready to go to trial on September 17th. Candidly, if we stayed here in Dallas, or we moved to New Orleans, I think we're all looking at a delay that would be one that approximates that. Again, even if we stayed here. So September 17 is a firm date insofar as Judge Bunton is concerned. We discussed different spots in the Western District. Judge Bunton sits in several different locations in addition to Midland. He sits on a regular basis in Austin. He goes to San Antonio, but he doesn't like it very much, and he goes to El Paso on a regular basis. I agree with Judge Bunton that El Paso would be the best place for the case to be tried. Now, the reason for that is that you're going to find that the publicity problem does not exist to the degree in El Paso that it does in Austin, or San Antonio, or Dallas or any other place in the state. He has a courtroom available. There's no courtroom problem. The travel time is not that much different from New Orleans insofar as flight time is concerned on Southwest Airlines. And there are other airlines that go to El Paso. If you're talking about Mississippi I think you're talking about a longer travel time, longer flight time than you are to El Paso. All things considered, I think the proper thing to do is to transfer the case to El Paso."

his later written order transferring venue, Judge Buchmeyer noted that "[t]he Government announced in open court that it does intend to file a motion asking that Judge Bunton transfer the September 16, 1991 trial from El Paso to Midland. The Court responded that this motion should be presented to Judge Bunton for his consideration." These statements further suggest that Judge Buchmeyer had not already ruled that Midland was an inappropriate venue. We also note that Midland is approximately 300 miles from Dallas, that Judge Bunton went to great lengths during jury selection to question the jury panel regarding adverse publicity,[14] and that intradistrict transfers have always been considered matters within the broad discretion of the trial court.[15] For all of these reasons we hold that the intradistrict transfer, if error at all, does not rise to the level of plain error.

C. *Joinder and Severance Issues*

Faulkner complains that there was misjoinder of the defendants in the indictment and that the district court erred in not granting his requests for severance. He had filed a motion to sever under FED. R. CRIM. P. 8(b), and had joined in Toler's

---

[14] The prospective jurors were given a forty-question juror questionnaire to fill out prior to jury selection. The questions were designed, among other things, to elicit information from the prospective jurors regarding their familiarity with the case and the defendants. The court conducted a lengthy voir dire, asking many questions regarding pretrial publicity. Numerous jurors familiar with press stories were excused.

[15] *E.g. Dickie*, 775 F.2d at 609; *Alvarado*, 647 F.2d at 539.

19

motion to sever the trial of Blain.  He argues that joinder is improper if based simply on non-criminal relationships between the defendants, such as friendship, business relationships or ongoing contact.  He specifically complains that several counts were based on conduct occurring after he retired in October of 1982, and that he was not even charged in seventeen of the counts that were submitted to the jury.

FED. R. CRIM. P. 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.  Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

The propriety of joinder under Rule 8 is determined on the basis of the allegations in the indictment, which are accepted as true barring allegations of prosecutorial misconduct.  *United States v. Kaufman*, 858 F.2d 994, 1003 (5th Cir. 1988); *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir.), *cert. denied*, 474 U.S. 908 (1985).  We have held that proper joinder requires that the offenses charged "must be shown to be part of a single plan or scheme," and that "[p]roof of such a common scheme is typically supplied by an overarching conspiracy from which stems each of the substantive counts."  *United States v. Lane*, 735 F.2d 799, 805 (5th Cir. 1984), *rev'd in part on other grounds*, 474 U.S. 438 (1986).  Initial joinder was proper because Count 1 of the indictment alleges that all defendants were members of the same conspiracy to defraud savings and loan institutions through the

device of fraudulent land loans, and that each defendant played an important role in this conspiracy. The substantive counts emanated from the same alleged conspiracy. Hence, under the letter of Rule 8(b) all defendants were alleged to have participated in the same series of acts or transactions constituting the criminal offense in Count 1. The Rule further makes clear that joinder is not improper because Faulkner and the other defendants were not all charged in each count.

FED. R. CRIM. P. 14 provides that a court may order a severance "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together . . . ." If joinder is proper in the first instance under Rule 8, the denial of a motion for severance in reviewable only for an abuse of discretion. *United States v. Holloway,* 1 F.3d 307, 310 (5th Cir. 1993). To demonstrate an abuse of discretion, the defendant "bears the burden of showing specific and compelling prejudice that resulted in an unfair trial," *id*. at 311, and such prejudice must be of a type "against which the trial court was unable to afford protection." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir.), *cert. denied*, 114 S. Ct. 266 (1993). We have further noted that "[t]he rule, rather that the exception, is that persons indicted together should be tried together, especially in conspiracy cases," and that "the mere presence of a spillover effect does not ordinarily warrant severance." *Id.*

21

We conclude that Faulkner has not established an abuse of discretion. While the trial was long, we believe that the jury was able to follow the evidence and the charge and reach a fair verdict. We note that each appellant was acquitted on one or more counts, which supports the inference that the jury considered separately the evidence as to each defendant and each count. *United States v. Buckhalter*, 986 F.2d 875, 877 (5th Cir.), *cert. denied*, 114 S. Ct. 203 (1993); *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied*, 493 U.S. 933 (1989). As to Faulkner's contention that he was unfairly prejudiced by counts relating to events occurring after his "retirement" in 1982, evidence was presented that his and Toler's retirement luncheon was a sham. Further, the court instructed the jury to "consider each offense and the evidence pertaining to it separately as to each Defendant. The fact that you might find some or all of the Defendants guilty of one of the offenses charged should not control your verdict with respect to any other offense charged against him or any of the other Defendants." Similar instructions have been held sufficient to cure any possibility of prejudice. *Zafiro v. United States*, 113 S. Ct. 933, 939 (1993); *Pofahl*, 990 F.2d at 1483 & n. 36.

D.   *Alleged Variance Between Proof and Indictment*

Faulkner, Toler and Formann argue that there is a fatal variance between the single conspiracy alleged in Count 1 of the indictment and the evidence adduced at trial. Toler further argues that the jury's verdict confirms such a variance. They

22

argue that the government never proved a single overarching conspiracy, and that they were prejudiced by being tried on such a theory. Count 1 of the indictment was brought under 18 U.S.C. § 371, and the indictment and jury charge alleged six categories of illegal acts of the conspiracy.[16] All four appellants were convicted on Count 1, but the jury did not find the same underlying substantive offenses as to each. The jury found that Faulkner and Toler conspired to misapply funds, that Blain conspired to obtain unlawful benefits, and that Formann conspired to inflate appraisals. Appellants claim that there was never a single conspiracy, and that the evidence at most showed the existence of several separate conspiracies. They argue that "the I-30 corridor cannot in this case legitimately serve to amalgamate the various and varying theories, objectives, acts,

---

[16] The Count 1 conspiracy count was brought under 18 U.S.C. § 371, which criminalizes conspiracies "to commit any offense against the United States, or to defraud the United States . . . ." The defendants were charged with conspiring: (1) to willfully misapply the monies and funds of the FSLIC insured institutions with intent to defraud the institutions, in violation of 18 U.S.C. § 657; (2) to have persons connected with the FSLIC insured institutions participate, share in and receive directly and indirectly monies, profit, and benefits through transactions and loans of the institutions with intent to defraud the Federal Home Loan Bank Board and the institutions, in violation of 18 U.S.C. § 1006; (3) to commit wire fraud in violation of 18 U.S.C. §1343; (4) to willfully overvalue land for the purpose of influencing the actions of the Bank Board and insured institutions upon loans, in violation of 18 U.S.C. § 1014; (5) to knowingly transport in interstate commerce money in excess $5,000, knowing the same to have been taken by fraud, in violation of 18 U.S.C. § 2314; and (6) to defraud the United States by hampering, impeding, impairing and obstructing the functions of the Bank Board in regulating, examining and supervising the activities of insured institutions, in violation of 18 U.S.C. § 371.

23

and transactions shown by the evidence into one overall conspiracy," and that "the evidence does not show the required unity of purpose or common design and understanding necessary to establish a single conspiracy."  Appellants cite *Kotteakos v. United States*, 328 U.S. 750 (1946) and other cases for the proposition that it is unfair to try a defendant under a theory of a single conspiracy where none in fact exists, since there is "the danger of transference of guilt, *i.e.*, the danger that despite demonstrating his lack of involvement in the conspiracy described in the indictment, a defendant may be convicted because of his association with, or conspiracy for unrelated purposes with, codefendants who were members of the charged conspiracy." *United States v. Hernandez*, 962 F.2d 1152, 1159 (5th Cir. 1992).

In reviewing a claim of fatal variance, the court should reverse only if the evidence at trial in fact varied from what the indictment alleged, and the variance prejudiced the defendant's substantial rights.  *United States v. Bruno*, 809 F.2d 1097, 1103 (5th Cir.), *cert. denied*, 481 U.S. 1057 (1987).  The government contends that this case is an example of a conspiracy "[w]here the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture . . . or where . . . the nature of the activity is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants . . . ."  *United*

24

*States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982). We agree. The nature of the dealings among the appellants, Sinclair and others was such that all were integral and important participants. The scheme required real estate developers (Faulkner, Toler) to make initial land purchases and submit overvalued appraisals (Formann, Tannehill) to a savings and loan (Blain, Jensen) in order to obtain loans for intermediate buyers (Sinclair, Blain and others). Syndicators (Sinclair and Hughes) would then sell the properties to other "investors" at a profit, and all participants in the scheme benefitted. The evidence, summarized above in the factual background, supports the jury's finding of a single overarching agreement among appellants and others to enrich themselves though the device of fraudulent real estate loans. The jury's finding that all four appellants did not conspire to commit the same federal offense does not compel a different conclusion.

> This court has found, in other contexts, that but a single conspiracy exists even though the agreement that constitutes it has several objectives and aims at the commission of several offenses. It is for this reason that the government need prove only that a conspirator agreed to one of the many objectives charged to hold him liable for the other objectives of the agreement. . . . Because one conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives. Some members may concur in only some of the many objectives, yet they are liable for all because there is but one scheme, one enterprise, one conspiratorial web.

*United States v. Rodriguez*, 585 F.2d 1234, 1249 (5th Cir. 1978) (citations omitted), *on rehearing en banc*, 612 F.2d 906 (5th Cir. 1980), *affirmed*, 450 U.S. 333 (1981). We conclude that the jury

25

found a single conspiracy. It was instructed that "proof of several separate conspiracies is not proof of the single conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges" and that "if you should find that a particular Defendant was a member of some other conspiracy, not the one charged in the indictment, then you must acquit that Defendant. In other words, to find a Defendant guilty you must unanimously find that he was a member of the conspiracy charged in the indictment and not a member of some other separate conspiracy." We presume that the jury followed the court's instructions, *Zafiro v. United States*, 113 S. Ct. 933, 939 (1993), and therefore do not agree with Toler that the verdict indicates that the jury found more than one conspiracy.

In considering whether one or multiple conspiracies exist, "the principal factors are (1) the existence of a common goal, (2) the nature of the scheme and (3) overlapping of participants in the various dealings." *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987). Here, appellants and others shared a common goal of enriching themselves by profiting from the leveraged selling and reselling of real estate along I-30. *Compare id.* ("the common goal driving all members of the single conspiracy in this case was their personal gain through the fraud of Pool Offshore.") The nature of the scheme was such that different participants played different but important functions necessary to its success. *Compare id. at* 1154 ("The nature of

26

this conspiracy was that each member had a different task and level of involvement . . . . The success of this conspiracy depended on the continued willingness of each member to perform his function."). Finally there was considerable overlapping of participants in the various dealings. While no two transactions were identical, Faulkner and Toler would typically make the initial purchase of the real estate and then sell it with the help of appraisers, bankers and others they knew well or had personally selected. The same small group of appraisers, bankers, closers, syndicators and brokers would share in the cash thrown off from the land flips that followed.

Further, even if the evidence established and the jury found the existence of separate conspiracies, we find no reversible error in trying the appellants under an indictment alleging one conspiracy. The jury plainly found in its verdict on Count 1 that all four appellants participated in *a* conspiracy, and the evidence is sufficient to support that verdict.[17] A variance between the offense charged in the indictment and the proof relied upon at trial constitutes reversible error only if it affects the substantial rights of the defendant. *Bruno*, 809 F.2d

_____

[17] Faulkner and Toler do not argue that the evidence failed to establish their participation in *a* conspiracy as alleged in Count I. Faulkner's brief claims that "several conspiracies [were] proved by the evidence," and that "the evidence in this case established multiple conspiracies." Similarly, Toler's brief states that "the jury made quite clear that what the government proved was not a single conspiracy as alleged, but multiple conspiracies with different objects." Only Formann claims insufficiency of evidence on Count 1 as a separate grounds for appeal. As explained below, we find the evidence sufficient as against him on this count.

at 1103; *United States v. Hernandez*, 962 F.2d 1152, 1159 (5th Cir. 1992), *quoted with approval in United States v. Limones,* 8 F.3d 1004, 1010 (5th Cir. 1993).  We do not find such a variance here.

We turn to the font of jurisprudence on this subject, *Kotteakos* itself, and find it distinguishable.  At the outset, we note that the Supreme Court's decision turned on the particular circumstances presented to it.[18]  There, the variance was such that (1) "[t]he indictment charged a single conspiracy only," 328 U.S. at 772, (2) "[t]he jury could not possibly have found, upon the evidence, that there was only one conspiracy," *id*. at 768, and (3) there was no cautionary instruction given to the jury regarding the transference of guilt.  "In *Kotteakos*, a single indictment charged thirty-two defendants with involvement in a single conspiracy.  Although the evidence established as many as eight separate conspiracies, the judge failed to give a precautionary jury instruction regarding transference of guilt." *United States v. Guerra-Marez*, 928 F.2d 665, 672 (5th Cir.), *cert. denied*, 112 S. Ct. 322 (1991).  The circumstances here are

---

[18]     The Court did not purport to create a bright-line rule of general application.  The Court noted:  "There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. . . . Leeway there must be for such cases as the [*Berger v. United States*, 295 U.S. 78 (1935)] situation and for others where proof may not accord with exact specifications in indictments. . . . The line must be drawn somewhere.  Whether or not Berger marks the limit, for this sort of error and case, we are clear that it must lie somewhere between that case and this one." *Kotteakos*, 328 U.S. at 773-74.

28

different.  The indictment most assuredly charged a single conspiracy and makes reference to "the conspiracy."  However, as explained above, this is not a case where the jury could not possibly have found one conspiracy.  Further, in our case the court gave cautionary instructions on transference of guilt.[19]

In addition, "[w]e have long held that when the indictment alleges the conspiracy count as a single conspiracy, but the `government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights.'" *United States v. Jackson*, 978 F.2d 903, 911 (5th Cir. 1992) (quoting *United States v. Richerson*, 833 F.2d 1147, 1155 (5th Cir. 1987)), *cert. denied*, 113 S. Ct. 2429 (1993).  *See also Limones*, 8 F.3d at 1010 (quoting *Jackson* with approval); *United States v. L'Hoste*, 609 F.2d 796, 801 (5th Cir.) ("If the Government proves multiple conspiracies and defendant's involvement in at least one of them, then clearly there is no variance affecting that

---

[19]    The jury was instructed:  "The indictment that you will consider as to these defendants, consists of 58 [sic] separate counts.  Not every Defendant is charged in each count of the indictment so you must consider each offense and the evidence pertaining to it separately as to each Defendant.  The fact that you might find some or all of the Defendants guilty or not guilty on one of the offenses charged should not control your verdict with respect to any other offense charged against him or any of the other Defendants."
The jury was also instructed:  "However, if you decide that such a conspiracy [as alleged in Count 1] did exist, you must then determine who the members were; and, if you should find that a particular Defendant was a member of some other conspiracy, not the one charged in the indictment, them you must acquit that Defendant."  In *Guerra-Marez*, we found that a similar instruction was one reason for concluding that there was no fatal variance between indictment and proof.  928 F.2d at 672 & n.7.

defendant's substantial rights."), *cert. denied*, 449 U.S. 833 (1980); *Jolley v. United States,* 232 F.2d 83, 88 (5th Cir. 1956) ("If more that one conspiracy was proved, of at least one of which the appellant was guilty, it is clear that there was no variance affecting his substantial rights."), *quoted with approval in United States v. Wayman*, 510 F.2d 1020, 1025 (5th Cir.), *cert. denied*, 423 U.S. 846 (1975).  We do not believe that our circuit has held this rule to be absolute;[20] nor do we believe that our circuit has delineated any clear-cut exceptions to this rule.  We do believe that doctrine regarding variance between an indictment alleging a single conspiracy and proof of separate conspiracies is but one subset of the general concerns of improper joinder and severance.[21]  We therefore conclude that where the indictment alleges a single conspiracy and the evidence establishes each defendant's participation in at least one conspiracy a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance.  For the reasons explained in the preceding section of this opinion, we do not conclude that

---

[20]    Indeed, such an absolute rule would be hard to reconcile with *Kotteakos* itself.  There, the Supreme Court accepted that several separate conspiracies had been proven by the evidence, 328 U.S. at 752, 755, 758, but nevertheless found reversible error.

[21]    *See United States v. Sutherland*, 656 F.2d 1181, 1190 n.6 (5th Cir. 1981) ("A strong argument can be made that a variance between a single conspiracy indictment and evidence of multiple conspiracies should be treated not as a `variance' problem at all, but rather as a `misjoinder' question under Federal Rule of Criminal Procedure 8(b)."), *cert. denied*, 455 U.S. 949 (1982).

joinder was improper or that the district court abused its discretion in denying the motions for severance. Hence, we would find no reversible error even if we agreed with appellants that the evidence and jury verdict established the existence of multiple conspiracies.

E.    *Denial of Request for Voir Dire Concerning Mid-Trial Publicity*

Toler complains that the district court erred in denying his request for a voir dire of the jury concerning mid-trial publicity. On the first day of trial, the district court admonished the prospective jurors at length on the importance of avoiding press reports during the trial.[22] At the beginning of

_____

[22]    The court stated at the close of voir dire: "Now, most important. If you don't remember anything else I say today, do not discuss anything you have seen or heard in this courtroom with any member of your family, or with anyone else. In all likelihood there is going to be an account of it in the daily newspapers. Do not read that account. Read Hagar instead, it is a lot better, probably more accurate. Don't read an account of it. When that portion of the news comes on, turn over to channel 36 if you are on cable, that gives the weather. You watch the weather instead of hearing a newspaper, I mean a reporter's account of this trial on the radio. When you go home if you are listening to the radio, as I normally do on my way back to Odessa, get a country and western song instead of listening to the news or if you want that sweet music you can get at 1510 or 1410, depending on whether you are in Midland or Odessa, or on AM or FM. Don't, really, you are not supposed to read anything about this."

Earlier in the voir dire the court had explained to the prospective jurors: "But what we must have in this country are people that can come from their homes and their businesses and their loved ones and sit in a jury box day after day and listen to the testimony and make a decision only on what they see and hear in this courtroom, not on anything in a newspaper, not on anything perhaps in a book, not on anything at all but what is contained within the walls of this courtroom. We need, everybody, the defendants and the Government, we need to start on a dry field. I think you can realize that if we don't start on a dry field, if you have got some pre-conceived idea or notion that

31

the second day of trail, after the jury was selected, the court

again admonished the jury to avoid press reports of the trial.[23]

Shortly thereafter, out of the jury's presence, counsel for

Faulkner informed the court that he had been told that on the

previous evening a local television newscast had reported that

the first trial had ended in a mistrial caused by jury

tampering.[24]  None of the attorneys indicated that they had seen

the broadcast, and counsel for Faulkner did not identify who had

informed him of the broadcast.  Counsel expressed his deep

concern that such a story would be prejudicial to his client, and

---

someone is already not guilty or that someone is already guilty,
before this trial is concluded you are going to be called on to
violate your oath under God.  The first thing that you are going
to do when you take your seat in this jury box is swear under
your God that you will a true verdict render, according to the
law and according to the evidence.  Now, if we don't start on a
dry field insofar as you are concerned, you are going to have to
violate that oath.  And I am sure I can speak for everyone that
is involved in this case, from the prosecution through the
defendants, we do not wish to be responsible for you having to
violate your oath under God.

[23]     The court stated:  "During the entire trial, however
long it lasts, you are not to read any account of this in the
newspaper.  You are not to listen to anything on the radio about
it.  You are not to watch anything on television about it.  I
know sometimes they sneak up on you on the radio or on
television, either.  But just turn it off in your mind or turn it
off at the set, or whatever it might be.  I am sure that if you
were a defendant in this case, you wouldn't want anybody deciding
whether or not you were innocent or guilty based on something
that somebody else had said or someone else had written.  Just
don't read it or listen to it or have anything to do with any
news account of it."

[24]     Faulkner's daughter was indicted and acquitted for jury
tampering after the first trial in Lubbock.  The juror in
question had been excused before jury deliberations.  Hence, any
report that the hung jury and the mistrial was the result of jury
tampering would be false.

32

asked the court to voir dire the jury to determine whether any members had heard the broadcast. The court denied this request, but offered "to tell them what happened at the last trial." Counsel for Blain suggested that the jury be advised "that there has been a prior trial and that the trial ended as a result of the jury's inability to reach a verdict, and specifically address that fact that you have been told there is news reports that the trial ended for some other reason and that is not true." Counsel for Toler then joined in the suggestions of counsel for Faulkner and Blain. The jury returned and the court advised it:

> [T]here was a previous trial. And the reason that we had to do it again is because the Judge did declare a mistrial in that case. I have been advised that there may have been a news account as to the reason for it, why they had a mistrial before, and the reason simply was that the Jury was unable to resolve the differences that they had in the case and could not render a verdict. That was the only reason.

At the end of the second day of trial, the district court again admonished the jury not to read or listen to press reports.

On a number of occasions this court has addressed whether the failure to conduct a jury voir dire concerning mid-trial publicity constitutes reversible error. Recently, we found that the failure to conduct such an inquiry was reversible error in *United State v. Aragon*, 962 F.2d 439 (5th Cir. 1992). *Aragon* offers a thorough analysis of the subject of mid-trial publicity and our court's treatment of the subject in prior cases, and accordingly provides a framework for our own analysis.

In *Aragon*, three defendants were convicted of drug offenses after a two-day trial in El Paso. On the first morning of the

33

trial, the city's largest newspaper published an article about one of the defendants on the first page of the metropolitan section. Among other things the article recounted (1) the defendant's prior history of drug arrests and convictions, (2) his alleged boasting of the smuggling of tons of marijuana through a smuggling pipeline, and (3) his dealings with a notorious narcotics kingpin. *Id*. at 441-42. The district court refused a request by defense counsel to conduct additional voir dire to determine whether any juror had read or heard of the article. On appeal this court explained that the denial of such a request is subject to review for abuse of discretion. *Id*. at 443. It further explained that voir dire is required if there could arise "serious questions of possible prejudice." *Id*. This question is to be answered by following a two-step inquiry to determine whether such "serious questions" exist:

> First, the district court must look at the nature of the news material to determine whether the material is innately prejudicial. Factors such as the timing of the media coverage, its possible effects on legal defenses, and the character of the material disseminated merit consideration. Second, the court must then discern the probability that the publicity has in fact reached the jury. At this juncture, the prominence of the media coverage and the nature, number, and regularity of warnings against viewing the coverage become relevant.

*Id*. at 444. Finally, the court noted that "[e]very claim of potential jury prejudice must turn upon its own facts. *Id*. *See also United States v. Herring*, 568 F.2d 1099, 1105 (5th Cir. 1978) (stating that "cases involving questions of prejudicial publicity necessarily tend to turn on their own facts").

34

In our case, we consider the issue a close one, and believe that the better practice would have been for the trial judge to conduct the requested voir dire.  Considering all of the circumstances, however, we cannot say that the court abused its discretion, and find *Aragon* and other cases finding reversible error distinguishable for a number of reasons.

First, the instructions given by the court in our case on the first day of trial, regarding the need to avoid press reports, were unusually lengthy and emphatic.  These instructions, reprinted at the margin, cannot fairly be characterized as boilerplate or casual recitations of standard jury instructions.  For example, one admonishment began with the words "now, most important" and "if you don't remember anything else I say today . . . ."  Another warning ended with the words "we do not wish to be responsible for you having to violate your oath to God."  *See United States v. Arzola-Amaya*, 867 F.2d 1504, 1514 (5th Cir.) (finding no reversible error where trial judge "was very careful and very specific" in giving two cautionary instructions prior to the introduction of evidence), *cert. denied*, 493 U.S. 933 (1989); *Aragon*, 962 F.2d at 445 (finding instructions inadequate where they were given "rather quickly and casually by the court").  Second, the court here gave a specific statement to the jury regarding the aspect of the broadcast alleged to be prejudicial, namely the statement in the broadcast that the earlier trial had ended in a mistrial due to jury tampering.  The court explained that the *only* reason for the

35

mistrial "simply was that the Jury was unable to resolve the differences that they had in the case and could not render a verdict." Such an instruction was in fact suggested by one of the defense counsel. Our prior cases have not involved a statement by the court to the jury attempting to rebut directly the alleged prejudicial statement in the press report.

Third, the jury acquitted all of the defendants on at least one count, and we have held that such acquittals weigh in favor of finding no abuse of discretion.[25] We do not believe that this fact standing alone is an important one, but we must agree with our prior panels that it should inform our analysis. Fourth, the instructions described above were given four times during the first two days of trial, and the court on numerous occasions throughout the trial continued to direct the jury to avoid press reports. The frequency of such warnings is a factor to consider in this context. *Aragon*, 962 F.2d at 444 (noting that number and regularity of warnings against viewing press coverage is relevant to the second step of the two-step inquiry); *United States v. Harrelson*, 754 F.2d 1153, 1164 (5th Cir.) (finding no reversible

---

[25]  *Arzola-Amaya*, 867 F.2d at 1514 ("The jury's ability to discern a failure of proof of guilt on some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of appellants['] right to a fair trial."); *United States v. Manzella*, 782 F.2d 533, 543 (5th Cir.) ("The jury's ability to discern [defendant's] innocence of some of the alleged crimes indicates a fair-minded consideration of the case against him. The not guilty verdicts reinforce our belief that the media coverage did not lead to the deprivation of [defendant's] right to an impartial jury."), *cert. denied*, 476 U.S. 1123 (1986).

36

error where court repeated cautionary instruction regarding extraneous matter each day of the trial), *cert. denied*, 474 U.S. 908 (1985).

Fifth, the district court and this court were given very sketchy details about the content of the broadcast in question. It is therefore difficult to determine just how potentially prejudicial the broadcast was. We have sufficient trust in our bar to presume that the broadcast occurred and that it did mention the mistrial and alleged jury tampering. However, none of the trial counsel actually saw the broadcast. Counsel for Faulkner stated that he had been told by others about the broadcast, but did not even identify those other persons. A tape or transcript of the broadcast is not available.[26] Defense counsel did not know for certain which network had broadcast the story, stating only that "I think it was an ABC affiliate."[27] We cannot tell whether the broadcast stated as an unqualified fact that jury tampering occurred, or whether it stated that such tampering had merely been alleged. We cannot know the length of the story, and whether the alleged jury tampering was the thrust

---

[26] *Compare United States V. Williams*, 568 F.2d 464, 466 n.2 (5th Cir. 1978) (giving verbatim transcript of mid-trial television news broadcast); *United States v. Attell*, 655 F.2d 703, 705 (5th Cir. 1981) (quoting from tape of television news broadcast included in the record).

[27] *Compare Aragon*, 962 F.2d at 441 (noting that press report was published in the city's most widely circulated newspaper).

of the story or a minor aside.[28]  We do not mean to suggest that

appellants waived their right to appeal this point by failing to

provide a copy of the broadcast.[29]  However, the lack of details

about the broadcast militates in favor of finding no abuse of

discretion.  For example, we have no basis for concluding that

the prejudicial impact of the broadcast approached the

prejudicial impact of the newspaper story in *Aragon*, which

described the defendant's prior drug history and convictions,

detailed his boasts of having imported tons of marijuana, and

linked him to a notorious drug kingpin.

Finally, we believe that the length of the trial is relevant

to determining the prejudicial impact of mid-trial publicity.

Here, the broadcast occurred on the first day of a trial that

lasted approximately seven weeks.  The press report in *Aragon*

came in the middle of a two-day trial.  We believe that, given

the length of the trial, the potential prejudicial impact of the

press report in our case was far less that the impact in *Aragon*.

F.    *The Deliberate Ignorance Instruction*

Toler complains that the district court erred in including

in the jury instructions a deliberate ignorance instruction.  The

instruction, given over Toler's objection, stated:

---

[28]    *Compare Manzella*, 782 F.2d at 541 (noting that prejudicial reference in newspaper article to defendant's prior conviction "occupied but one short paragraph in a lengthy article.").

[29]    *Cf. Attell*, 655 F.2d at 705-06 (holding that defendant should be given the benefit of the doubt as to jury's exposure to news reports where court failed to conduct voir dire).

38

The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond reasonable doubt of a conscious purpose to avoid enlightenment would permit in [sic] inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact.

It is entirely up to you as to whether you find any deliberate closing of the eyes, and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

"We review jury instructions to determine `whether the court's charge as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Stouffer*, 986 F.2d 916, 925 (5th Cir.), (quoting *United States v. August*, 835 F.2d 76, 77 (5th Cir. 1987)), *cert. denied*, 114 S. Ct. 115 (1993). Toler does not contend that the instruction was an incorrect statement of the law, but claims that it was not factually supported by the evidence presented. While we have stated that a deliberate ignorance instruction "should rarely be given," *United States v. Ojebode*, 957 F.2d 1218, 1229 (5th Cir. 1992), *cert. denied*, 113 S. Ct. 1291 (1993), we have also "consistently upheld such an instruction as long as sufficient evidence supported its insertion into the charge." *United States v. Daniel*, 957 F.2d 162, 169 (5th Cir. 1992).

This court employs a two-part test in determining whether a deliberate ignorance instruction can be given. "The evidence must show that: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2)

39

the defendant purposely contrived to avoid learning of the illegal conduct." *Ojebode*, 957 F.2d at 1229. Toler focuses on the second element of this test. He suggests that a deliberate ignorance instruction cannot be submitted absent evidence that the defendant engaged in affirmative acts to avoid knowledge of wrongdoing, and that no such evidence was presented here. We do not agree that affirmative acts to avoid knowledge must always be shown. We have held that in some cases the likelihood of criminal wrongdoing is so high, and the circumstance surrounding a defendant's activities and cohorts are so suspicious, that a failure to conduct further inquiry or inspection can justify the inclusion of the deliberate ignorance instruction.[30]

Here, viewing the evidence in the light most favorable to the government,[31] the circumstances of the real estate

_____

[30]    *Stouffer*, 986 F.2d at 925 ("Despite knowing that he and his cohorts were using the DITA funds to pay for pleasure trips, exorbitant bonuses, and speculative real estate ventures, Stouffer blindly accepted without further investigation Atchley's representations that FUTCO's corporate charter authorized all of the `investments.' Therefore, Stouffer's conduct suggests a conscious effort to avoid incriminating knowledge."); *Daniel*, 957 F.2d at 169-70 ("The circumstances in this case were so overwhelmingly suspicious that the defendants' failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge."); *United States v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990) ("Courts also have determined that the circumstances of the defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge.") (emphasis in original).

[31]    "In assessing [defendant's] challenge to the deliberate ignorance instruction, we must, of course, review the instructions in their totality and the jury's verdict; in so doing, we must view the evidence in the light most favorable to the government." *United States v. Chen*, 913 F.2d 183, 186 (5th

transactions were extraordinarily suspicious.  By way of example only, the jury was presented with a wealth of evidence, including the testimony of four alleged coconspirators (Sinclair, Hutson, Nelson and Hughes) from which it could conclude that Toler, an experienced real estate developer and close associate of Faulkner, was aware of most or all of the following: (1) Faulkner and Toler reaped enormous profits of tens of millions of dollars each by selling land along I-30 for a relatively brief two-year period, (2) the loans which made these profits possible were never denied and rapidly approved, (3) subsequent loans on the properties were likewise always or almost always approved, (4) Faulkner and Toler were always able to dictate the price they wanted for the properties they sold, and likewise could dictate who would receive commissions or other payments at closing and in what amounts, (5) Toler and Faulkner made a loan to Blain that enabled him to take over Empire, (6) with the help of Faulkner, Toler and Sinclair, Blain became an intermediate seller of one of the properties and a received profit of approximately $15 million,  (7) Paul Jensen, a young newcomer to Dallas, gained influence or control over two savings and loans, made over $100 million dollars in loans for Toler/Faulkner projects, and in short order was living in a multi-million dollar landmark Dallas mansion, (8) the closer, bankers and appraisers for the I-30 were lavished with gifts and bonuses, (9) Empire's board members included Jane Nix, the closer on all of Faulkner's deals, and

Cir. 1990).

Brenda Kennedy, a close friend of Faulkner who received millions of dollars in commissions on the property sales despite a lack of any apparent effort on her part (10) direct evidence of ownership of properties by Toler and Faulkner was sometimes concealed in the chain of title, (11) even when properties were bought and sold in rapid succession, sometimes on the same day, the appraisals were always high enough to support the loans, (12) buyers would not put up any cash for a down payment, and typically walked away from the closing with cash in their pockets and a loan large enough to pay all closing costs and future interest payments for some period of time, (13) sales of properties by Faulkner and Toler never fell through due to lender concern about the creditworthiness of a borrower or the value of the property pledged as collateral, (14) separate accounts were created at the title company for the benefit of Faulkner and Toler, and Toler had suggested destroying what sparse records existed on the accounts, and (15) the area was being overbuilt and arms-length sales of the condominiums were far from justifying the level of loans and construction.

This is not to say that Toler was not entitled to present evidence and receive a lengthy jury instruction[32] on his theory

---

[32] Toler and Faulkner requested and received lengthy jury instructions on their general theory of the case. Toler's instruction stated in part: "Mr. Toler contends that he made no misrepresentations to any lending institution or regulatory authorities; that he did not conspire or agree with anyone else to do so; and that he had no knowledge that any misrepresentations would be or were being made . . . . Mr. Toler submits that he was a businessman dealing at arm's length with the savings and loans or their representatives, and that . . . he

of the case -- that he was unaware of any wrongdoing and was simply a gifted or lucky businessman who legitimately prospered during a real estate boom that was not of his making. However, under these circumstances we find no error in including the deliberate ignorance instruction.[33] The instruction is appropriate where a defendant claims a lack of guilty knowledge and the evidence at trial supports an inference of deliberate

_____

was entitled to sell land to those institutions at any price they were willing to pay, and to benefit from any loans they were willing to make to borrowers who were buying land from him. Mr. Toler denies that he participated in or knew of any bribes or illegitimate payments by Mr. Sinclair or others to any bankers. He contends that he was unaware of transactions in which Tommy Nelson and Larry Powell received $2 million from Kitco, or in which Paul Jensen received a $4 million home or other monies from selling land to Kitco, or in which Spencer Blain received $1,400,000 from Mr. Sinclair. . . . Mr. Toler contends that he and Mr. Faulkner loaned funds to Spencer Blain for the purchase of Empire shock, in order to relieve Mr. Faulkner of liability on a $750,000 promissory note at First City Bank secured by the Empire stock. Mr. Toler also sold the property later known as Chalet Ridge to Mr. Blain, and assisted Mr. Blain in arranging a loan . . . for the purpose of buying this land and paying off the loans for Mr. Toler and Mr. Faulkner on the Empire stock. Mr. Toler contends that in each of these transactions he acted for the legitimate business interests of himself and Mr. Faulkner, and denies that he made any misrepresentations to anyone or provided any illegitimate benefits to Spencer Blain. Finally, Mr. Toler admits he was aware that Spencer Blain sold the Chalet Ridge property to Kitco, Sinclair and Cansler in February 1983 for a large profit, but denies he either arranged that sale or had anything to do with determining the price paid."

[33] Faulkner and Blain adopt all of the arguments raised by Toler, but make no attempt to brief this fact-specific issue as it relates to them. *See Lara-Velasquez*, 919 F.2d at 952 ("Appellate review of a deliberate ignorance instruction is necessarily a fact-intensive endeavor."). However, we conclude that the instruction was appropriately given as to them as well, employing essentially the same analysis we employ above as to Toler.

indifference.  *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993).

G.    *Sufficiency of Evidence Points*

Appellants challenge the sufficiency of the evidence to support their convictions.  In assessing the sufficiency of the evidence, we determine whether, viewing the evidence and the inferences that may be drawn therefrom, a rational jury could have found the essential elements of the offense beyond a reasonable doubt.  *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir.), *cert. denied*, 112 S. Ct. 2952 (1992).  We review the evidence, whether direct or circumstantial, and all reasonable inferences drawn therefrom in the light most favorable to the verdict.  *United States v. Salazar*, 958 F.2d 1285, 1290-91 (5th Cir.), *cert. denied*, 113 S. Ct. 185 (1992).  "[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  *United States v. Stephens*, 964 F.2d 424, 427 (5th Cir. 1992).

1.    *Formann*

Formann was convicted of conspiracy under Count 1, seventeen counts of submitting false appraisals under 18 U.S.C. § 1014, two counts of wire fraud under 18 U.S.C. § 1343, and one count of misapplying funds of a federally insured institution under 18

44

U.S.C. § 657.  He claims insufficient evidence as to all of these counts.

To establish guilt for conspiracy, the government must prove beyond a reasonable doubt that two or more people agreed to pursue an unlawful objective together, that the defendant voluntarily agreed to join the conspiracy, and that one of the members of the conspiracy performed an overt act to further the conspiracy. *United States v. Parekh*, 926 F.2d 402, 406 (5th Cir. 1991).  Each element may be inferred from circumstantial evidence.  *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993); *United States v. Shivley*, 927 F.2d 804, 809 (5th Cir.), *cert. denied*, 111 S. Ct. 2806 (1991).

In rendering its verdict on Count 1, the jury found that of the four defendants only Formann conspired to overvalue land under § 1014.[34]  As explained above in the discussion of the variance issue, the jury's failure to find that the three other appellants had not conspired with Formann to overvalue land does not mean that Formann's conspiracy conviction cannot stand.[35]  We

---

[34]    This statute now provides that "[w]hoever knowingly makes any false statement or report, or willfully overvalues land, property or security, for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the [FDIC] . . . shall be fined not more that $1,000,000 or imprisoned not more that 30 years, or both."  18 U.S.C.A. § 1014 (West Supp. 1993).  The version of the statute in effect at the time of the alleged conduct imposed different penalties and included reference to the FSLIC.  The parties stipulated that Empire and Bell were insured by the FSLIC.

[35]    We also note that in *United States v. Zuniga-Salinas*, 952 F.2d 876, 877 (5th Cir. 1992) (en banc), we held that a conspiracy conviction need not be set aside even when the sole alleged coconspirator is acquitted.  Prior to that we had held on

45

find sufficient evidence that Formann was part of the overall conspiracy alleged in Count 1 and that he conspired with Paul Tannehill, Larry Hutson or others to inflate the appraisals. Formann was a former examiner for the Federal Home Loan Bank Board and had at one time served as the managing officer of a Texas savings and loan institution. The jury could reasonably infer that he understood the role his appraisals played in the I-30 loans and land flips. Evidence was presented that Formann had numerous dealings with Faulkner and Sinclair, and that appraisals were prepared on the I-30 properties at each stage of the land flips. "Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy. . . . The members of a conspiracy which functions through a division of labor need not have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy." *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987). Tannehill was Formann's boss during part of 1982 and 1983. He signed appraisals prepared by Formann during this period. Formann and Tannehill had a joint interest in one I-30 property and succeeded in reselling it at a profit. The two

---

numerous occasions that a defendant's conspiracy conviction can be upheld even if all other alleged coconspirators tried with him are acquitted, so long as the indictment alleges other named or unnamed coconspirators and there is sufficient evidence of a conspiracy involving these other individuals who were not tried with the defendant. *E.g. United States v. Price*, 869 F.2d 801, 804 (5th Cir. 1989); *United States v. Sheikh*, 654 F.2d 1057, 1062 (5th Cir. 1981), *cert. denied*, 455 U.S. 991 (1982). Here the indictment alleged known and unknown coconspirators including Paul Tannehill.

received a fixed percentage of each appraisal fee paid. While working with Tannehill Formann could not sign appraisals since he was not an MAI appraiser. At one point in 1983 one of Tannehill's employees suggested that the company cease preparing appraisals on the I-30 properties because the workload had become too great. Tannehill's response was, "I know it, Dolly, but I am in too deep and I can't get out, I have to unload my condos first." The jury could reasonably infer that they conspired to inflate appraisals. Formann claims that there was no evidence that any alleged coconspirator ever asked him to inflate any requested appraisal. However, "[a] conspiracy agreement may be tacit," and "[n]o evidence of overt conduct is required." *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348 (5th Cir. 1988). Larry Hutson, another appraiser, testified that there was no need to tell Toler and Faulkner he was falsifying appraisals, because "[t]hey knew what the values were." Likewise, he testified that when Ray Evans of Empire would request an appraisal, "he would ask me to appraise a particular tract and he would usually tell me what his loan amount was and I would do some calculations and come up with an appraisal price to cover the loan amount . . . . He knew what the sales price was, he knew what the loan amount was. I mean, I didn't say this is a false appraisal. He was smart enough to know that."

Formann further claims that the conspiracy count and the individual substantive counts on which he was convicted for overvaluing land under § 1014 were not supported by sufficient

evidence that land was overvalued and that he intentionally overvalued land. To prove a violation of § 1014 the government must show that the defendant knowingly made a false statement as to a material fact to a financial institution for the purpose of influencing the financial institution's decision. *United States v. Trice*, 823 F.2d 80, 85 (5th Cir. 1987). Intent can be inferred from the fact that the defendant made statements with the capacity to influence the institution's decision. *United States v. Stephens*, 779 F.2d 232, 237 (5th Cir. 1985). We find sufficient evidence that Formann intentionally overvalued the properties in his appraisals.[36] The evidence established that Faulkner and Toler would simply decide what they wanted for their property, and that appraisals on these initial sales and later sales were always supported by appraisals valuing the properties at or above the sales price. When asked how the appraisals were obtained, Sinclair testified that Faulkner and Toler arranged for the appraisals, and that most came from Formann. Sinclair testified that Faulkner originally introduced Sinclair to Formann, and that Faulkner described Formann as "his appraiser." Expert witnesses testified that the appraisals were seriously flawed, inconsistent, and otherwise highly overvalued. Expert testimony was offered that the appraised land values were so high

---

[36] Toler argues that his convictions for aiding and abetting Formann's violations of § 1014 should be reversed on grounds that if the court accepts Formann's insufficiency of evidence claims on these counts, it should likewise reverse Toler's aiding and abetting convictions. Since we affirm Formann's convictions under these counts we reject this argument.

48

that the market would not support condominiums built on them, and that mere incompetence could not explain the inconsistent adjustments in the appraisals and nonconformities with appraisal theory, since they always erred in the same direction -- above the actual selling price. Other witnesses with knowledge of land values in the area testified that they did not believe the land could be worth the appraised values. Sinclair testified that on one group of appraisals, Formann told him he had been given a value to reach by Faulkner and Toler. Hughes testified that on one appraisal Faulkner and Toler were informed that Formann was not going to reach a value needed for a transaction, and that Faulkner "had a little talk with Mr. Formann and we received the appraisal." Larry Hutson testified that although he sometimes served as a "review appraiser" for Formann, he in fact did no review at all and would simply sign his name to the appraisals. At one point Sinclair testified that he did not remember discussing a particular appraisal with Formann "other than the fact that we told [Formann] what we had to have per square foot, and the appraisals were always placed in there higher than the selling price." On another occasion Sinclair, at Faulkner's suggestion, paid Formann an up-front bonus of $30,000 to prepare appraisals on two properties. He received other smaller bonuses from Sinclair as well. Formann complains that the experts did not personally prepare appraisals on the various properties. On these facts, however, we do not agree that the preparation of such appraisals was essential to the government's proof.

49

Formann also asserts that appraisals on land that has not yet sold are necessarily mere opinions, cannot be characterized as "true" or "false," and do not fall within the purview of § 1014. He cites *Williams v. United States*, 458 U.S. 279 (1982), which held that an alleged check-kiting scheme did not fall within §1014. The Court reasoned:

> Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." . . . Each check did not, in terms, make any representation as to the state of petitioner's bank balance.

*Id*. at 284-85. We find *Williams* distinguishable. An appraisal, unlike a check, contains statements as to the fair market value of property, and § 1014 expressly reaches one "who willfully overvalues land." In *Williams*, the Court was faced with a situation where the statute "does not explicitly reach the conduct in question . . . ." *Id*. at 286.

Formann also complains that he was convicted on several counts relating to appraisals signed by Paul Tannehill. These appraisals indicated that Formann assisted in their preparation. Evidence was presented that while Formann worked for Tannehill, Formann was assigned to do the I-30 appraisals. Tannehill would sign all of the appraisals Formann worked up, because that was the practice at that office, and because industry practice was to have appraisals signed by an MIA appraiser, the MIA designation indicating membership in the American Institute of Real Estate

50

Appraisals. At the time Formann was not an MIA appraiser. On all of these counts we note that Formann was indicted under § 1014, but was also indicted under 18 U.S.C. § 2 for aiding and abetting Tannehill. A defendant may be convicted for aiding and abetting the commission of a crime if he was "`associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed.'" *United States v. Parekh*, 926 F.2d 402, 406 (5th Cir. 1991) (quoting *United States v. Holcomb*, 797 F.2d 1320, 1328 (5th Cir. 1986)). As to the appraisals signed by Tannehill, we find sufficient evidence to support all of the convictions for overvaluing land under § 1014 or for aiding and abetting Tannehill to commit these offenses. Tannehill's signature on these appraisals may go to the weight of the evidence, but does not in our view render the evidence insufficient on these counts.

Count 13 involved an appraisal for a property known as "On The Point." Neither Formann nor Tannehill signed this appraisal; however, Tannehill had an ownership interest in this property, and Formann had an undisclosed profits interest and received one-third of the profit made on the resale of the property. Larry Hutson testified that he prepared an overvalued appraisal on this property at the request of Tannehill. Tannehill explained to him that another appraiser must sign off on this appraisal since Tannehill could not appraise property that he owned. Hutson met with Formann and Tannehill regarding the appraisal, and was told by Tannehill the dollar figure that was needed in the appraisal.

Formann had prepared a preliminary handwritten appraisal report. Tannehill and Formann supplied Hutson with backup documents as well to accompany the report. Formann made a profit of approximately $226,000 when the property sold. We find this evidence sufficient to uphold Formann's conviction on this count.

Formann claims insufficient evidence to sustain his wire-fraud convictions under Counts 10 and 48. He recognizes that under the *Pinkerton* rule "[a] party to a conspiracy may be held responsible for a substantive offense committed by a coconspirator in furtherance of the conspiracy, even if that party does not participate in or have any knowledge of the substantive offense," *United States v. Garcia*, 917 F.2d 1370, 1377 (5th Cir. 1990), but argues that these conviction should be overturned since his conspiracy conviction cannot stand. We have concluded, however, that the conspiracy conviction should stand.

Formann also claims insufficient evidence to support his conviction under Count 12, for aiding and abetting Blain's misapplication of funds under 18 U.S.C. § 657. Establishing an offense under § 657 requires the government to prove that (1) the defendant was an officer, agent or employee of, or connected in some way with, a federally insured savings and loan association, (2) he willfully misapplied funds of the association, and (3) he acted with intent to injure or defraud the association. *United States v. Hopkins*, 916 F.2d 207, 215 (5th Cir. 1990). Under this statute, "one way that the Government may prove willful misapplication of funds is by showing that a person has

deliberately converted bank funds to his own use or to the use of a third person, or that the person has used funds in violation of the law." *Id*. This count concerns a loan made by Blain to finance the sale of On The Point. We find evidence from which a rational jury could conclude that (1) Formann had an undisclosed profits interest in this property, (2) he assisted in the preparation of a false appraisal on it, (3) Tannehill was unable to sell condominiums on this project and wanted out of it (4) Faulkner and Tannehill agreed on a sales price that would assure Formann and Tannehill each received over $200,000 when the property sold, (5) Blain had Empire make the loan for the sale, (6) Faulkner prevailed upon Sinclair, Hughes and Cansler to purchase seven condominiums each (7) Empire relied on Formann and Tannehill to supply appraisals, and (8) the sale was just one more of a series of inflated land sales which furthered the conspiracy by enriching at least two of the conspirators and perpetuating the appearance of a land boom where properties were rapidly selling at ever-increasing prices. We find this evidence sufficient to support Formann's conviction as a substantive offense committed in furtherance of the conspiracy, and under a theory of aiding and abetting.

2. *Other Sufficiency Claims*

Faulkner claims insufficient evidence to support his conviction under Count 37, a wire fraud count based on a wire transfer. The wire transfer for approximately $6.5 million was from Ozark Service Corporation (Ozark), a subsidiary of First

State Building & Loan Association of Mountain Home, Arkansas (First State), another lender on I-30 projects. Ozark was similar to Empire's subsidiary, Statewide, in that both invested directly in the I-30 projects. The offense of wire fraud requires proof of a scheme to defraud and the use of interstate wire communications in furtherance of the scheme. *United States v. Shivley*, 927 F.2d 804, 813 (5th Cir.), *cert. denied*, 111 S. Ct. 2806 (1991). The indictment alleged that the Count 1 conspiracy was the scheme to defraud. As explained above, we have concluded that the conviction of all appellants on Count 1 should stand. Hence, under general conspiracy law their "culpability extends to all substantive offenses committed in furtherance of that conspiracy." *United States v. Berkowitz*, 662 F.2d 1127, 1140 (5th Cir. 1981). Further, under the wire fraud statute in particular, "[o]nce membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *Shivley*, 927 F.2d at 813 (quoting *United States v. Westbo*, 746 F.2d 1022, 1025 (5th Cir. 1984). We find sufficient evidence that the wire transfer was in furtherance of the overall conspiracy described in Count 1. Evidence was submitted to support the following scenario. The wire transfer was connected with two projects known as Bahama Glen and The Cabanas. Ozark owned an interest in the Cabanas, a project built on property earlier sold by Faulkner and Toler. Empire had funded the Ozark purchase. The Cabana units were not

54

selling and Ozark wanted to unload them. Tommy Nelson of First State agreed to fund the purchase of Bahama Glen in exchange for Faulkner's and Toler's agreement to help Ozark out of The Cabanas. Like Blain and Jensen, Nelson was richly rewarded for serving as a lender on the I-30 properties. On one occasion Faulkner and Sinclair arranged a complicated land flip whereby one Sinclair company sold property to Nelson and repurchased it from him in the course of a single closing, netting Nelson $1 million. Toler found buyers for the Cabanas and arranged for Empire to finance the sale. The buyers include Sinclair, Kenneth Cansler, Wailen York, and Ernie Hughes. Ozark earned a substantial profit on the sale. Ozark then funded the sale of Bahama Glen. Faulkner and Toler each made $1.4 million on the sale. Hughes found investors to purchase Bahama Glen. The money to close the Bahama Glen sale was the subject of the wire transfer alleged in count 37. We agree with the government that the jury could conclude that "[t]he entire transaction concocted by Faulkner, Toler, Blain, and Nelson was designed to enable the co-conspirators to purchase yet another piece of inflated property, thereby enriching themselves through the funding of another loan, and to prevent Nelson's defaulting on the Cabanas, which might have alerted the bank regulators to the scheme and frightened off potential future investors."

A similar analysis applies to the remaining insufficiency claims. Faulkner claims insufficient evidence with respect to Counts 38 and 43. These counts assert violations of 18 U.S.C. §

55

1006 by Blain, and aiding and abetting by Faulkner and Toler. They concern payments Blain received in connection with Empire loans on projects known as Spring Garden and Cheshire Creek. A violation of § 1006 may be established by proof that (1) the defendant was an officer, agent, or employee of a federally insured savings and loan association, (2) that he knowingly and willfully participated, shared, or received, directly or indirectly, benefits through any transaction or loan of the bank, and (3) that he acted unlawfully and intended to defraud or deceive the institution or United States. *Id*. It makes no difference whether the objective of the fraud was to obtain an advantage or to cause the principal to suffer a loss. *United States v. Munna*, 871 F.2d 515, 517 (5th Cir. 1989), *cert. denied*, 493 U.S. 1059 (1991). Again, the evidence is sufficient to establish that Blain violated the statute and that this offense was in furtherance of the conspiracy. Faulkner discussed with Sinclair and Blain his interest in purchasing a larger Lear jet through a land transaction. He indicated that if Blain would finance the transaction Blain would receive his other Lear jet and a condominium. Blain loaned Sinclair $1.8 million to purchase Spring Glen. When the land was resold, Blain received the condominium, the jet, and approximately $3 million, which was received through a trustee. Such rich rewards for Blain were in furtherance of the conspiracy, since Blain controlled Empire and made all of Empire's loan decisions. Similar evidence was presented regarding Cheshire Creek. A Toler company contracted

56

to buy the property. Empire loaned approximately $2 million for the initial purchase of this property. It was subdivided and resold by Ernie Hughes through a second, much larger loan from First Savings and Loan Association of Burkburnett. Hughes testified that the Cheshire Creek transaction was arranged by Faulkner and Toler as a means of benefitting Blain. Faulkner and Toler each made over $3 million from the resale. Blain's daughters received more that $400,000 from the sale. Blain also directed payments to three other Empire directors intended to enable them to purchase Blain's stock in Empire and allow him to retire to Colorado. By it terms § 1006 does not require direct payment to the defendant, and covers a defendant "who participates or shares in or receives directly or indirectly" profits or benefits through any transaction or loan by a savings and loan. Again, this evidence is sufficient to establish that Blain violated § 1006, and that this violation was in furtherance on the conspiracy.

Toler complains of the wire fraud convictions related to brokered deposits. The indictment alleged 24 counts of wire fraud for 24 separate occasions where brokered deposits were wired to Lancaster, Empire and Bell. Six of these counts were submitted to the jury, the others having been dismissed on the government's motion. Blain, Toler and Faulkner were all convicted on all six counts. Evidence was presented that Faulkner, Blain and Toler were all aware of the use of brokered deposits and that such deposits were essential to supplying the

huge growth in deposits needed by the institutions to fund the I-30 loans. Evidence was also offered that Faulkner and Toler paid the broker's fee on some of these deposits, that on occasion Faulkner would talk to one of the brokers, and on one such occasion had thanked him "for the money we were sending and keep up the good job and etc., etc." As to counts 65 and 66, evidence was offered that the Bell's brokered deposits were used on a specific Faulkner project known as Faulkner Meadows II, one of the projects on which inflated appraisals were prepared and which was otherwise a part of the alleged conspiracy. In interpreting the similar mail fraud statute, we have held that "when an individual does an act with the knowledge that the use of the mails will follow in the ordinary course of business, or when such use can reasonably be foreseen, even though not actually intended, then he/she `causes' the mails to be used" under that statute. *United States v. Shaid*, 730 F.2d 225, 229 (5th Cir.), *cert. denied*, 469 U.S. 844 (1984). *See also United States v. Bruno*, 809 F.2d 1097, 1104 (5th Cir.) (cases construing mail fraud statute apply to wire fraud statute as well), *cert. denied*, 481 U.S. 1057 (1987). We find the evidence sufficient to affirm the convictions on these counts.

As to the four other counts, however, no evidence was offered that the brokered deposits described were actually used on one of the I-30 projects or were directly linked in any way to the conspiracy. An essential element of wire fraud is the use of interstate communications in furtherance of the scheme to

defraud.  *Id*.  We think the general use of brokered deposits by Empire and Lancaster to fund the I-30 loans and, for all we know, other totally unrelated loans, is simply too little evidence to sustain these convictions.  Accordingly, we vacate the convictions of Blain, Toler, and Faulkner or Counts 52, 53, 60, and 61.[37]

H.    *RICO Points*

Blain, Faulkner and Toler were convicted of conspiring to violate the RICO statute, 18 U.S.C. § 1962(d), as alleged in Count 88 of the indictment.  They raise several challenges to their RICO conviction and the forfeiture ordered under the statute.  The indictment charged conspiracy to violate § 1962(c).

Faulkner and Toler argue that when a defendant is charged with conspiracy to violate RICO, the government must prove that the defendant agreed to personally commit or personally aid or abet at least two predicate offenses, or actually commit two predicate acts.  *See, e.g., United States v. Phillips*, 664 F.2d 971, 1039 (5th Cir. 1981) (finding that defendant could be convicted of conspiring to violate RICO "so long as he committed or agreed to commit and least two separate crimes in furtherance of the conspiracy's single objective"), *cert. denied*, 457 U.S. 1136 (1982).  Appellants claim that under this standard there is insufficient evidence to sustain the RICO convictions, and that

---

[37]    We recognize that reversing these convictions are of very small consolation to these appellants, since the court imposed sentences under these counts concurrent to other sentences, and since it imposed fines against Faulkner and Toler of only $1,000 on these counts.

59

the jury was erroneously instructed that "the government may establish a defendant's membership in the conspiracy by proof that he agreed that another would violate § 1962(c) by committing two acts of racketeering." The government argues that this circuit has not squarely addressed this issue, and that the majority of circuits require only that a defendant agree with other conspirators that two predicate acts will be committed pursuant to the conspiracy. *E.g. United States v. Neapolitan,* 791 F.2d 489, 494-500 & n.3 (7th Cir.) (rejecting requirement that defendant agrees personally to commit two predicate acts, and concluding that the Fifth Circuit has not "definitively resolved this issue."), *cert. denied*, 479 U.S. 939 (1986). We need not resolve this issue. The jury verdict form asked whether Blain, Toler and Faulkner were guilty under Count 88, and then inquired as to which racketeering acts each defendant committed or agreed to commit. The jury checked off numerous racketeering acts as to each defendant. It specifically found that each of the three had committed or agreed to commit wire fraud under Counts 37, 65 and 66.[38] As addressed above, we find sufficient

---

[38] The jury was further instructed that "even though you may have already addressed two or more of the substantive counts of the indictment which are charged as separate racketeering acts in the RICO conspiracy, the proof must show that such racketeering acts, if committed, were committed pursuant to an agreement to willfully conduct or participate in the conduct of the affairs of the enterprise alleged in Count 88 through a pattern of racketeering activity, in accordance with the instructions pertaining to Count 88." It was also instructed that "it is not enough that the alleged conspirators agreed to commit the acts of racketeering alleged in the indictment, without more, or that they agreed merely to participate in the affairs of the same enterprise. Instead, the government must

60

evidence that each violated the wire fraud statute under these counts.

Faulkner and Toler also claim insufficient evidence to support the RICO forfeiture verdict under 18 U.S.C. 1963(a)(1), which provides for forfeiture to the government of "any interest [defendant] has acquired or maintained in violation of Section 1962." Faulkner and Toler were assessed $40 million and $38 million penalties, respectively. These figures were based on amounts received by Faulkner and Toler, their companies and family members. They do not demonstrate any computational errors in these figures,[39] but they argue that they should not be forced to forfeit amounts that went to their families and companies. We find sufficient evidence that they "acquired or maintained" the amount forfeited. The evidence showed that they had control over the disbursement of the proceeds of the land transactions, and directed the disbursements from a land sale after it was deposited in an account of their choosing. *See Russello v. United States*, 464 U.S. 16, 21 (1983) ("It undoubtedly was because Congress did not wish the forfeiture provision of § 1963(a) to be limited by rigid and technical definitions drawn from other areas of the law that it selected the broad term

---

prove beyond a reasonable doubt that the alleged conspirators agreed to conduct the affairs of the enterprise through a `pattern of racketeering activity' as that term has been defined elsewhere in these instructions."

[39] Counsel for Toler stated at oral argument: "It was a hot, hot market. Jim toler took advantage of the situation. He made 38 million dollars in a year and a half. That was not even disputed. I think we put that evidence in in a chart."

61

`interest' to describe the things that are subject to forfeiture under the statute.  Congress selected this general term apparently because it was fully consistent with the pattern of the RICO statute in utilizing terms and concepts of breadth."); *Neapolitan*, 791 F.2d at 495 (noting that RICO must be liberally construed to effectuate its remedial purposes); *United States v BCCI Holdings (Luxembourg), S.A.*, 795 F. Supp. 477, 480 (D.D.C. 1992) ("In light of the deliberately broad language of § 1963 and the ambitious purpose of RICO, interpretation of the term `interest' to include the assets of a racketeering corporation's alter ego clearly is warranted.").

Appellants also argue that the evidence is insufficient to show that the proceeds would not have been acquired but for the defendant's racketeering activity.  *United States v. Ofchinick*, 883 F.2d 1172, 1183 (3d Cir. 1989), *cert. denied*, 493 U.S. 1034 (1990) and other cases impose such a "but for" test.  However, we do not agree with appellants' suggestion that the amounts subject to forfeiture must be directly linked or traced to the specific racketeering acts proved.  For example, we do not agree with Faulkner that the brokered deposits made the basis of one racketeering act found by the jury must be tied to a particular loan.  We agree with the government that the forfeiture should reflect the scope of the offense.  The RICO offense here is not merely the commission of particular predicate acts, but a conspiracy to "conduct or participate, directly or indirectly, in the conduct of" an enterprise.  18 U.S.C. § 1962(c).  *See United*

62

*States v. Elliot*, 571 F.2d 880, 902 (5th Cir.) ("[T]he object of RICO conspiracy is to violate a substantive RICO conviction -- here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity -- and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity."), *cert. denied*, 439 U.S. 953 (1978). We conclude that sufficient evidence was offered as to the profits earned by appellants from the overall RICO conspiracy.[40]

Appellants also complain that the court improperly instructed the jury that a violator of RICO "shall, as part of the penalty, forfeit any interest he has acquired or maintained in violation of Section 1962." They claim that the instruction should not have been written in mandatory language, and instead should have told the jury that it "may" direct a forfeiture. They cite *United States v. Cauble*, 706 F.2d 1322, 1348 (5th Cir. 1983), *cert. denied*, 465 U.S. 1005 (1984), where we stated that a proper jury instruction should "include language that suggests that a jury *may* find an interest or contractual right forfeitable . . . ." There the court was addressing whether there must be a

---

[40] *Compare United States v. Madeoy*, 912 F.2d 1486, 1495 (D.C. Cir. 1990) ("The appellants claim that their forfeiture should be reduced to reflect only the proceeds from the 11 properties that the jury identified on the verdict form. Contrary to the appellants' assertion, however, the scope of their RICO enterprise is not necessarily limited to the 11 properties that the jury specifically indicated in its substantive RICO verdict. The district court correctly instructed the jury that it could convict the appellants under RICO without considering whether they committed every predicate act."), *cert. denied*, 498 U.S. 1105 (1991).

nexus between the defendant's conduct and the property claimed. The case cannot be read to suggest that forfeiture is a matter left to the jury's discretion once the elements of forfeiture are established. Here the instruction properly followed the statute, which provides that whoever violates "section 1962 . . . *shall* . . . forfeit . . . any interest he has acquired or maintained in violation of section 1962 . . . ." 18 U.S.C. § 1963(a) (emphasis added).

CONCLUSION

The convictions of Faulkner, Blain and Toler on Counts 52, 53, 60 and 61 are vacated. In all other respects the judgments of conviction and sentences are affirmed.