district court indicated at the sentencing hearing and in his opinion that he would "consider appropriate fines" in sentencing these defendants, the fines ultimately imposed were against only Anthony Corrado and Jack Tocco for $140,131 and $94,447, respectively, amounts substantially less than any claimed forfeiture. Neither of these fines was adequate to take the place of the forfeitures sought. Indeed, in the absence of any forfeiture, the fines are very light considering these partners' conduct in the longstanding Detroit enterprise.

Accordingly, we **REVERSE** the district court and direct that forfeiture amounts be assessed against the following defendants in the respective amounts, jointly and severally:

1.   Against *Vito Giacalone* in the amount of $234,700 (street taxes); plus $1,000,000 (extortion from Sal Vitello), for a total of $1,234,700. In addition, we direct a remand to the district court to determine under correct standards the degree and extent, if any, of Giacalone's forfeiture related to the sale of the Edgewater Hotel.

2.   Against *Jack Tocco* in the amount of $234,700 (street taxes); plus $1,000,000 (extortion from Sal Vitello), for a total of $1,234,700. In addition, we direct a remand to the district court to determine under correct standards the degree and extent, if any, of Tocco's forfeiture related to the sale of the Edgewater Hotel.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0345P (6th Cir.)
File Name: 00a0345p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
      *Plaintiff-Appellant,*

            v.                                    No. 98-2315

PAUL CORRADO; JACK W.
TOCCO; VITO W. GIACALONE;
NOVE TOCCO; ANTHONY J.
CORRADO,
         *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-80201—John Corbett O'Meara, District Judge.

Argued: June 16, 2000

Decided and Filed: September 27, 2000

Before: WELLFORD, NELSON, and GILMAN, Circuit
Judges.

_____

### COUNSEL

**ARGUED:** Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. Terrance G. Reed, REED & HOSTAGE, Washington, D.C.,

for Appellees.   **ON BRIEF:**   Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant.   Terrance G. Reed, REED & HOSTAGE, Washington, D.C., Harold Z. Gurewitz, Margaret Sind Raben, GUREWITZ & RABEN, Birmingham, Michigan, Robert M. Morgan, Detroit, Michigan, Frank D. Eaman, BELLANCE, BEATTIE & DeLISLE, Harper Woods, Michigan, Carole M. Stanyar, Detroit, Michigan, for Appellees.

---

## OPINION

---

HARRY W. WELLFORD, Circuit Judge.  The five named defendants in this case were convicted of conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), as alleged members of the Detroit Mafia.  Based on those convictions, the government sought a forfeiture against the defendants pursuant to 18 U.S.C. § 1963(a)(3), and the parties agreed to have the district judge decide the forfeiture amount.  On October 23, 1998, the district court issued an order finding that the government was not entitled to any forfeiture, because, among other things, the evidence was insufficient to trace the allegedly illegal proceeds to each particular defendant.  The government has filed this timely appeal.  We now reverse as to defendants Jack Tocco and Vito William Giacalone, and we will withhold our opinion as to defendants Paul Corrado, Nove Tocco, and Anthony Corrado pending the outcome of our remand of their related appeals.  *See United States v. (Paul) Corrado*, Nos. 98-2269/2365/2270, 2000 WL 1199096 (6th Cir. August 24, 2000), *and United States v. (Anthony) Corrado*, Nos. 98-2394/99-1001 (6th Cir. 2000).

## I.  BACKGROUND

The five defendants were charged, along with twelve other defendants, in a twenty-five-count indictment relating to their alleged involvement in the Detroit branch of the national

the evidence was insufficient to calculate accurately a forfeiture award with respect to these proceeds.

### E.  Eighth Amendment

We have stated that any forfeiture award must comport with the Eighth Amendment prohibition against "cruel and unusual punishment" or "excessive fines."   *See United States v. Sarbello*, 985 F.2d 716, 717-18 (3d Cir. 1993) (holding that the mandatory statutory penalty may be reduced to conform to the Eighth Amendment).  Though neither defendant has argued that the forfeiture sought by the government violates this constitutional provision, we are satisfied that there has been no Eighth Amendment violation under the circumstances of this case, particularly in light of the seriousness of the offenses charged and the great amounts of income derived through the activities of this enterprise over the years.

### IV.  SUMMARY

In conclusion, we reiterate that the district court clearly erred in holding that the proceeds from the illegal acts of Jack Tocco and Giacalone, which were proved beyond a reasonable doubt, must be traced directly back to each defendant in order to warrant a forfeiture of those proceeds.  Section 1963(a) requires that the convicted defendant "shall forfeit" to the United States "any property constituting, or derived from, any proceeds which the person obtained, *directly or indirectly*, from racketeering activity or unlawful debt collection."  (Emphasis added).  Furthermore, "the amounts subject to forfeiture [need not] be directly linked or traced to the specific racketeering acts proved" where the RICO offense "is not merely the commission of particular predicate acts, but a conspiracy to 'conduct or participate, directly or indirectly, in the conduct of' an enterprise."  *Faulkner*, 17 F.3d at 775 (quoting 18 U.S.C. § 1962(c)).  In addition, co-conspirators in a RICO enterprise should be held jointly and severally liable for the reasonably foreseeable proceeds of the enterprise, and are not limited to amounts each defendant personally "obtained."  *See United States v. Simmons*, 154 F.3d 765, 769-70 (8th Cir. 1998).  Though the

#### vi.  *Unlawful gambling proceeds*

Evidence as to these alleged payments or distribution of revenues from the Detroit enterprise to defendants springs primarily from Angelo Polizzi's testimony.  Jack Tocco and Vito Giacalone, as partners, were identified as periodic recipients of unlawful gambling proceeds.  As indicated above, Angelo Polizzi testified about information given him by his father Michael, also a partner in the Detroit Cosa Nostra.  According to Angelo Polizzi, his father received periodic illegal gambling "draws" of between $700 and $1,000 per week in 1994. Further, Polizzi accompanied his father in delivering draws to other partners.  The district court noted that there was a paucity of any corroborating evidence to support Polizzi's statements.  The district court, therefore, declined "to use *30 years of weekly draws* as a basis for calculating an amount to be forfeited." (Emphasis added.)

Polizzi also testified that Christmas bonuses totaling $30,000 were paid to his mother for the benefit of his father while Michael was incarcerated (on the Nevada gambling casino matter).  Sal Vitello also testified that he paid Giacalone substantial amounts annually as Christmas bonuses over many years.  Because the district court found that there was insufficient proof that "Jack Tocco or Anthony Corrado benefitted from these payments made to avoid labor problems," it declined to award forfeiture with regard to these payments to Giacalone.

Although this is a close issue, we affirm the decision of the district court in this regard, because the evidence regarding the amounts of these proceeds is speculative at best.[4]  Our decision, it should be noted, is not based upon the district court's decision that any such draws or bonuses were not shown to have "benefitted" Jack Tocco.  Rather, we find that

---

[4] At p. 55 of the government's brief, there appears this statement: "The Government concedes that the exact computation of the amounts requested [in this regard] is difficult."

Mafia organization known as the "Cosa Nostra."  Jack Tocco and Anthony Corrado were convicted on two counts of conspiracy under RICO, one based on a pattern-of-racketeering-activity (count 1) and one based upon the collection-of-unlawful-debts (count 2), and on one count of a Hobbs Act conspiracy, 18 U.S.C. § 1962(d) (count 6).  Paul Corrado and Nove Tocco were convicted of the RICO pattern of racketeering activity conspiracy (count 1) and the Hobbs Act conspiracy (count 6).  Vito Giacalone pled guilty to the RICO collection of unlawful debts conspiracy (count 2), and his plea agreement stated specifically that "nothing in this agreement will limit the defendant's liability [as to criminal forfeiture]."

On the basis of those convictions, the government sought a forfeiture for proceeds derived from the defendants' respective crimes.  Specifically, the government alleged that all five defendants were jointly and severally liable for $234,700 that was collected in "street tax" extortions.[1]  The government further claimed that Jack Tocco, Anthony Corrado, and Vito Giacalone, in addition to the $234,700 amount, were jointly and severally liable for $4.2 million in profits that the conspiratorial enterprise allegedly received from the sale of two hotels in Las Vegas (the Frontier Hotel and the Edgewater Hotel), $1 million that the conspiracy extorted from Sal Vitello, and $38,400 it received in proceeds from the collection of unlawful gambling debts.  Thus, the government sought a total forfeiture amount of $5,473,100.

The district court concluded that the evidence presented by the government at trial did not provide, by a "preponderance of the evidence," a sufficiently quantified factual basis for assessing any forfeiture against the defendants.  The court stated that "[t]he proceeds of the illegal activity upon which the jury based its guilty verdicts were insufficiently sourced to the illegal activities upon which the RICO convictions were

---

[1] The "street tax" referred to herein is a type of "franchise fee" allegedly extorted from bookmakers who ran illegal gambling businesses that were not affiliated with the Detroit group.

based and insufficiently tracked into the hands of the co-conspirators or the individual defendants involved here for the court to make any forfeiture award." Consequently, the court denied the government's request for a forfeiture judgment. The government filed this timely appeal.

## II. JURISDICTION

On May 28, 1999, Jack Tocco moved to dismiss this appeal based on an alleged lack of appellate jurisdiction and on double jeopardy grounds. He claimed that 18 U.S.C. § 3742(b) does not provide a basis on which the government can appeal the district court's decision, and that, even if a statutory basis existed for the appeal, a reversal of the district court's $0 forfeiture award would violate the Double Jeopardy Clause. The other defendants joined in Jack Tocco's motion.

On August 10, 1999, a three-judge panel of this court rejected the defendants' motion to dismiss, and the basis of that decision was set out succinctly:

> A criminal forfeiture is an element of sentencing and not an element of a criminal offense. *See Libretti v. United States*, 516 U.S. 29 (1995). Thus, an appeal by the government may be authorized by 18 U.S.C. § 3742(b). *See United States v. Infelise*, 159 F.3d 300 (7th Cir. 1998); *United States v. Investment Enterprises, Inc.*, 10 F.3d 263 (5th Cir. 1994). Moreover, as a general rule, except in death penalty cases, Double Jeopardy does not apply to sentencing. *Monge v. California*, 524 U.S. 721 (1998). Therefore, we decline to dismiss the government's appeal at this time. However, because the issues raised in the motions to dismiss are intertwined with the merits of the appeal, the parties are directed to address these issues in their appellate briefs.

Thus, the panel denied the motion "without prejudice to subsequent reconsideration by the panel to be assigned to hear this appeal on the merits." We now reconsider the defendants' allegations.

Christmas bonuses. He concluded that he paid about $1,000,000 to Giacalone in total. The government sought to use this testimony as a basis for an additional amount of forfeiture. The district court rejected that position, stating that "[t]he government offered no evidence to show that the money paid to Giacalone was ever shared by others in the Detroit partnership."

In our view, the evidence was sufficient to show that Giacalone obtained $1,000,000 from Sal Vitello for his assistance in using his influence and strong-arm support in challenging the unions. We find Giacalone was obviously empowered to help Vitello based on his membership in the Detroit "family." Although the district court declined to forfeit these proceeds because there was no offer of "evidence to show that the money paid to Giacalone was ever shared by others in the Detroit partnership," we find this conclusion by the district court to be clearly erroneous, certainly as to Vito Giacalone himself.

Giacalone pled guilty to the conspiracy allegations in count two, but count one charges were "realleged and incorporated by reference" in count two. Giacalone's activities with Vitello, acknowledged to have occurred by reason of his guilty plea, were related to the alleged purposes of the RICO conspiracy and his acts were ongoing and reflected continuity as discussed in the conspiracy principles section hereinabove. Even if the evidence supports a finding that Giacalone acted on his own in extorting money from Vitello, "it is not determinative that [he] committed the crime to further his own agenda, if indeed he was only able to commit the crime by virtue of his position with the enterprise." *Salinas*, 522 U.S. at 63. Thus, the district court clearly erred in requiring that the government demonstrate that Giacalone shared with his co-conspirators the proceeds received from Vitello. The court should have assessed the forfeiture amount of $1,000,000 against Giacalone and Jack Tocco, jointly and severally.

"participation" of defendants Anthony Corrado and Vito Giacalone and their "involvement" in the Edgewater Hotel transaction. As previously pointed out, the district court's requirement that "the Detroit partnership" must have "received and distributed among themselves" proceeds or monetary benefits from the Edgewater in order for forfeiture to attach was erroneous if any of the lead partners obtained financial benefits by reason of their "participation or involvement" in that enterprise.

We find irrelevant the district court's observation that "the gambling activity carried on by these hotels was not illegal." The illegality of the transactions was the Detroit enterprise's concealment and misrepresentation involved in acquiring the secret interest held by the Detroit Cosa Nostra through straw men such as Pompili. This latter activity was sufficiently related to the charged conspiracy's pattern and practice of illegal activity with respect to gambling to put defendants on notice concerning potential forfeiture from the sale of the Edgewater Hotel. Item No. 13 of the indictment as to count one charged it "to be a part of the conspiracy" to use "fronts or straw men" to acquire interests in Nevada hotel casinos and "to conceal their interests from the State of Nevada." Thus, we find that there was sufficient proof to establish that the Edgewater Hotel transaction was a part of the conspiracy herein, particularly as to Vito Giacalone (and as to Anthony Corrado if he is not granted a new trial upon remand). However, there is sufficient uncertainty as to the profits or revenues derived from that transaction to necessitate a remand to the district court on the Edgewater forfeiture question. Thus, upon remand, the district court should consider, under the standards herein established as to forfeiture, to what extent or degree forfeiture should be ordered against Jack Tocco and Vito Giacalone.

### v. *Extortion from Sal Vitello*

Silverio (Sal) Vitello testifed that he paid Vito Giacalone $1,000 per week for about 10 years to assure labor peace. He also stated that he gave Giacalone random cash payments and

### A.  *Basis for Appellate Jurisdiction*

Title 18 U.S.C. § 3742(b) is the principal statute that provides circumstances under which the government may appeal a district court's sentencing determination. That section provides in pertinent part:

> **(b)  Appeal by the Government.--**The Government may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence–
>
> **(1)** was imposed in violation of law:
>
> **(2)** was imposed as a result of an incorrect application of the sentencing guidelines . . .;
>
> **(3)** was imposed for an offense for which a sentencing guideline has been issued . . ., and the sentence is less than [the sentence specified or the sentence stated in any plea agreement]; or
>
> **(4)** was imposed for an offense for which no sentencing guideline has been issued . . . and is less than the sentence specified in a plea agreement, if any . . .;
>
> and the Attorney General or the Solicitor General personally approves the filing of the notice of appeal.

18 U.S.C. § 3742(b); *see* 15B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3919.8 (SUPP. 2000).

In this case, the government filed a certificate of compliance, which acknowledges the approval of the Solicitor General for the filing of the notice of appeal in this case. The opening statement of the government's appeal sets forth the basis of its challenge:

> The Government appeals from the forfeiture judgments of $0 which the district court entered against five

defendants convicted of RICO conspiracy in a case which targeted the Detroit Cosa Nostra. The Government appeals the amount of forfeiture entered as to all five defendants with regard to the amount of forfeiture assessed for the proceeds of the street tax extortion predicate act of count one. In addition, as to defendants Jack Tocco, Anthony Corrado, and Vito Giacalone only, the Government appeals the district court's failure to assess any amount of forfeiture as to the other predicate acts of count one and as to the RICO collection of unlawful debt conspiracy in count two.

The defendants argue that the government's appeal does not fall into any of the provisions of § 3742(b) and, therefore, this court lacks jurisdiction to hear the appeal. We disagree.

It is well-established "[t]hat the government has no right of appeal in a criminal case unless a statute expressly grants such a right." *United States v. Investment Enterprises, Inc.*, 10 F.3d 263, 270 (5th Cir. 1993). A criminal forfeiture award is a part of the defendant's sentence, not part of the substantive offense of conviction. *Libretti v. United States*, 516 U.S. 29, 39 (1995). Thus, where the government alleges that the $0 award of forfeiture was imposed in violation of the law, the government has the statutory authorization to appeal. *See United States v. Infelise*, 159 F.3d 300 (7th Cir. 1998) (holding that an order of forfeiture is part of the defendant's sentence and is appealable by the government); *Investment Enterprises*, 10 F.3d at 270-71 (finding that forfeiture is part of the defendant's sentence and is appealable by the government where the sentence was allegedly imposed in violation of the law).

## B. Double Jeopardy

The defendants argue that, even if statutory authority exists for this appeal, allowing the government to challenge the district court's $0 award of forfeiture violates the Double

the invitation to reverse the district court with respect to this $1,000,000 forfeiture request.

### iv. Sale of the hotels - Edgewater

The evidence regarding the sale of the Edgewater Hotel, however, is a different matter. FBI agent Ruffino testified that he overheard a conversation between Anthony Corrado, Vito Giacalone, and William Pompili, where they were discussing the sale of their interest in the Edgewater. Ruffino stated that he received from the sale of the hotel "$800,000 and $1.6 million and having another $800,000 on December 31st," totalling $3.2 million. The district court attributed none of the $3,200,000 value to Anthony Corrado, Giacalone or Jack Tocco because "the involvement in the Edgewater Hotel was not connected to the Detroit partnership *except through the participation of members Anthony Corrado and Vito William Giacalone*." (Emphasis added). Again, because the government did not show that "the Detroit partnership received and distributed among themselves any amount of money . . . from the sale," forfeiture was denied, even as to Giacalone and Anthony Corrado.

In addition to the testimony of agent Ruffino, corroborating evidence from the Nevada Gaming Commission was submitted regarding the Edgewater interest. Also, there was evidence that Giacalone had meetings with Pompili, since deceased, in Las Vegas, and that Jack Tocco and Anthony Corrado also met with Pompili, who had architectural plans for the Edgewater Hotel and Casino.

Based on this evidence, which is considerably more substantial than the evidence relating to the sale of the Frontier, we find that it was clear error for the district court to deny forfeiture against Jack Tocco and Giacalone, jointly and severally, for the profits that the members of the enterprise shared from the sale of the Edgewater Hotel. The continuing activities were related to the illegal purposes of the conspiracy charged, and Giacalone's and Corrado's personal involvement confirms that the Cosa Nostra was involved in obtaining these illegal proceeds. The district court itself acknowledged the

organization of which they were a part.    Recorded conversations between Nove and Paul indicate that they were working with (or for), or were empowered by, the "capos" Jack Tocco and Anthony Corrado.  Because the amount of proceeds from this activity was quantifiable from the evidence at trial, and because the evidence showed that the scheme was related to the entire criminal enterprise of which these defendants were active members, we find that the district court committed clear error in failing to hold Jack Tocco and Giacalone jointly and severally liable for forfeiture of the street tax proceeds.

### iii. Sale of the hotels - Frontier

The government asserted that the profits made from the sale of the hotel interests were a basis for forfeiture against Jack Tocco and Vito Giacalone.  With respect to the sale of the Frontier Hotel specifically, evidence was submitted solely through the testimony of Anthony Polizzi, who testified that the hotel was sold to Howard Hughes for a $1,000,000 profit. Polizzi testified that his father stated that he and his partners each received unspecified shares of the proceeds from the sale.  Michael Corrado and Anthony Zerilli were convicted and imprisoned for conspiracy to acquire and maintain hidden interests in the Frontier Hotel gambling and casino operation. Further, Polizzi testified that he heard Jack Tocco thanking his father for his efforts in obtaining the interest on behalf of the partnership.

While we believe this is a close issue, we cannot ignore that there is relatively little corroborative evidence on this account.  The sale of a hotel is a complicated transaction, yet there was no evidence that any of the defendants were personally involved, nor is there any evidence to corroborate the alleged statements made by Michael and related to his son regarding the involvement of the enterprise.  The evidence of the "thank you" comment of Jack Tocco is not sufficient to show that the entire group was involved in this substantial transaction.  Based on this scant evidence of a connection between the enterprise and the sale of this hotel, we decline

Jeopardy Clause.[2]  They argue that the district court, sitting as the agreed trier of fact, reviewed the evidence and made the determination that no forfeiture award was warranted.  Thus, the defendants argue, they are entitled to that "acquittal," and the government's appeal would unconstitutionally subject them to being put in double jeopardy of criminal forfeiture.

The prior panel that decided this issue rejected the defendants' claim based on *Libretti v. United States*, 516 U.S. 29 (1995), and *United States v. Monge*, 524 U.S. 721 (1998). In *Libretti*, the Supreme Court held that criminal forfeiture was an aspect of sentencing following the conviction of a substantive criminal offense. *Libretti*, 516 U.S. at 39.  The Court stated specifically that "Congress plainly intended forfeiture of assets to operate as punishment for criminal conduct in violation of the federal drug and racketeering laws, not as a separate substantive offense." *Id.*  In support of its decision, the Court observed:

> Our precedents have likewise characterized criminal forfeiture as an aspect of punishment imposed following conviction of a substantive criminal offense.    In *Alexander v. United States*, 509 U.S. 544 (1993), we observed that the criminal forfeiture authorized by the RICO forfeiture statute "is clearly a form of monetary punishment no different, for Eighth Amendment purposes, from a traditional 'fine.'"    *Id.*, at 558. Similarly, in *United States v. $8,850*, 461 U.S. 555 (1983), we recognized that a "criminal proceeding . . . may often include forfeiture as part of the sentence." *Id.*, at 567.

*Id.*

---

[2]The Double Jeopardy Clause of the Fifth Amendment provides, "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

In *Monge*, the Court held that, except in death penalty cases, the Double Jeopardy Clause does not apply to sentencing:

> The Double Jeopardy Clause "does not provide the defendant with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be." *DiFrancesco*, 449 U.S., at 137. Consequently, it is a "well-established part of our constitutional jurisprudence" that the guarantee against double jeopardy neither prevents the prosecution from seeking review of a sentence nor restricts the length of a sentence imposed upon retrial after a defendant's successful appeal. See *id.*, at 135 . . . .

*Monge*, 524 U.S. at 730; *see also United States v. DiFrancesco*, 449 U.S. 117, 141 (1980).

Subsequently, with four of the justices participating in the *Monge* majority decision dissenting, the Supreme Court decided *Apprendi v. New Jersey*, No. 99-478, 2000 WL 807189, 120 S.Ct. 2348, ___ U.S. ___ (June 26, 2000). In that case, the defendant was convicted pursuant to a guilty plea for unlawful firearm possession. He was subsequently sentenced to an extended term under New Jersey's hate crime statute because the court made the finding of fact, by a preponderance of the evidence, that the defendant had committed the crime with a biased purpose. The Supreme Court reversed, holding that, when a defendant's sentence is increased beyond the statutory maximum based on any fact other than the fact of a prior conviction, that fact must be submitted to a jury and proved beyond a reasonable doubt, rather by a preponderance of the evidence. *See id.*, at *13. Justice Stevens, writing for the majority, made the following conclusion:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the

offense solely by virtue of his position in the enterprise; or (2) the offense was related to the activities of the enterprise.

*Locasio*, 6 F.3d at 943.

### ii. Street taxes

The district court denied any forfeiture award against Nove Tocco, Paul Corrado, and the other defendants despite much evidence of recorded conversations between Nove and Paul regarding their forceful collections of the street tax from bookmakers engaged in illegal gambling. The $234,700 in street tax proceeds was calculated from the amounts taken from statements that the two were "generating about $100,000 a year off the street" from the business. Conservatively estimating that the activity continued for one and one-half years in the early 1990s, the government concluded that Nove and Paul generally collected about $150,000 over 18 months. In addition, more specific evidence showed that about $84,700 was extorted from Ramzi Yaldoo and George Yatooma, both of whom testified at trial as to the amounts extorted from them. Thus, the evidence was undisputed that Nove Tocco and Paul Corrado were engaged in this extortionate activity, receiving at least $234,700.

The district court determined that Paul and Nove were acting on behalf of the conspiratorial enterprise and that their collection of the street taxes should be attributable to the members of the enterprise. From our review of the transcripts of the tape recordings, we find that it was clear error for the district court to fail to attribute those proceeds to Jack Tocco and Giacalone, who were members of the criminal enterprise. The government should not have been required to prove that Nove and Paul shared their collections with other partners. Nor was it required to show the proportion of sharing or to trace these extortionate collections back to each member. The entire illegal scheme could not have succeeded were it not for the support, or the use of the name and the reputation of, the conspiratorial enterprise. Witnesses testified that they believed that Nove and Paul were supported by the larger

The government was charged with proving that the predicate acts in connection with the conspiracy were related to its illegal purposes, and that these acts constitute a threat of ongoing criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Sedima, S.P.R.L. v. Imrex*, 473 U.S. 479, 496 (1985). The standard, which was met in this case as to the pertinent RICO conspiracy counts, is known as the "relationship plus continuity test." *Imrex*, 473 U.S. at 496 n.14. "In defining a 'pattern' . . . Congress [provided that] '[c]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics.'" *Id.*.

In considering the continuity prong of the requirements of proof, the Supreme Court has defined what is required:

> [T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime."

*H.J., Inc.*, 492 U.S. at 242-43.

As to relationship or relatedness, "[t]he business of a criminal enterprise is crime [and its] crimes form a pattern defined by the purposes of the enterprise." *United States v. Masters*, 924 F.2d 1362, 1366 (7th Cir. 1991); *see also United States v. Eufrasio*, 935 F.2d 553, 565-66 (3d Cir. 1991). The predicate acts do not necessarily need to be directly interrelated; they must, however, be connected to the affairs and operations of the criminal enterprise. *United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993); *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985). We adopt the holding in a somewhat similar organized-crime case on the relatedness question:

> [T]he relatedness requirement can be satisfied by proof that: (1) the defendant was enabled to commit the

concurring opinions in that case: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." 526 U.S., at 252-253, 119 S.Ct. 1215 (opinion of STEVENS, J.); *see also id.*, at 253, 119 S.Ct. 1215 (opinion of SCALIA, J.).

*Id.* (footnote omitted) (relying on *United States v. Jones*, 526 U.S. 227 (1999)).

Jack Tocco argues to this court that *Apprendi* supports his position that he has a "legal right to a factual determination by a trier of fact in the District Court," presumably proven beyond a reasonable doubt. We hold, however, that *Apprendi* is not applicable under the circumstances of this controversy. The jury determined that the defendants were guilty of the RICO charges beyond a reasonable doubt. The convictions were based on proof of specific charges and the defendants were put on notice under the indictment that criminal forfeitures under 18 U.S.C. § 1963 would be pursued once these underlying criminal convictions were obtained. This is an entirely different circumstance from the situation in *Apprendi*.

As recognized in *Libretti*, criminal forfeiture has been deemed to be a part of the sentence in criminal proceedings of the type involved in this case. *Libretti*, 516 U.S. at 39; *see also United States v. $8,850*, 461 U.S. 555, 567 (1983) (recognizing that forfeiture is a part of the sentence). "The simple fact [is] that forfeiture is precisely that punishment." *Libretti*, 516 U.S. at 41. There is no requirement under *Apprendi*, or in any other precedent cited by the defendants, that the jury pass upon the extent of a forfeiture, particularly when the parties, represented by counsel, have stipulated that the district court will decide that issue. Moreover, "[s]entencing decisions favorable to the defendant . . . cannot generally be analogized to an acquittal" as the defendants contend in this case. *Monge*, 524 U.S. at 729. Accordingly,

we reject the defendants' argument that the jury must decide the extent of forfeiture or that the district court, as the agreed trier of fact, must make fact determinations based on the "beyond a reasonable doubt" standard. *See United States v. DeFries*, 129 F.3d 1293, (D.C. Cir. 1997) (recognizing that, under *Libretti*, "[t]he government must prove its forfeiture allegations by a preponderance of the evidence").

In sum, we hold that the criminal forfeitures sought in this case constitute a part of the defendants' sentences, and are appealable under § 3742(b). In addition, we find that, in accordance with the Supreme Court's decision in *Monge*, the Double Jeopardy Clause does not apply to sentencing and, therefore, does not prohibit the government from appealing the district court's forfeiture award.

## III.  MERITS OF THE APPEAL

As has been indicated above, the government sought a total forfeiture amount of $5,473,100  pursuant to 18 U.S.C. § 1963(a)(3), which provides for the forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962." Though the government sought to hold all of the defendants jointly and severally liable for the $234,700 collected as street taxes, the government claimed that Jack Tocco, Anthony Corrado, and Vito Giacalone were also jointly and severally liable for the remainder through the sale of the hotels ($4.2 million), the extortion from Sal Vitello ($1 million), and the collection of unlawful gambling debts ($38,400).

The district court concluded, however, that the evidence did not provide a sufficiently quantified factual basis for any of the claimed forfeiture amounts. The court surmised:

While the jury found each of the defendants (except Vito William Giacalone, who pleaded guilty) guilty . . . it did so based on evidence so disparate in time and nature to have, in the court's opinion, rendered it

to be the "Boss" of this illegal enterprise, the head of members and capos (supervisors). Many members were charged in this case with participation in criminal activities "for financial gain," and the Boss and capos shared in the division of revenues, as allegedly did members, such as defendants Nove Tocco and Paul Corrado. Count one named the defendants as having engaged in a racketeering conspiracy involving extortionate credit or loan activities and collections, obstruction of justice, witness tampering, extortion, illegal gambling, and various conspiracies involving these acts and violent offenses, and acquiring concealed interests in Las Vegas gambling facilities. That count also charged that *each defendant* agreed that certain predicate acts of racketeering would be committed in carrying out the illegal enterprise and conducting its affairs. Each of these defendants, except for Giacalone who pled guilty, were found to be guilty of count one.

Unlike the general conspiracy statute, § 1962(d) requires no "overt act or specific act" in carrying it forward. *Salinas v. United States*, 522 U.S. 32, 63 (1997). Furthermore, "the supporters are as guilty as the perpetrators . . . so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." *Id.* at 64. A RICO conspirator "may be convicted 'so long as he' agrees with such other person or persons that they *or one or more of them* will engage in conduct that constitutes such crime." *Id.* at 65 (quoting the Model Penal Code § 5.03(1)(a) (1962) (emphasis added)). *Salinas*, moreover, summarizes these conspiracy principles applicable to the RICO charges in counts one and two: "A conspiracy may exist even if a conspirator does *not agree* to commit or facilitate *every* part of the substantive offense. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253-54 (1940)." *Id.* at 63 (emphasis added). We agree that "it is not determinative that the defendant committed the crime to further his own agenda, if indeed he was only able to commit the crime by virtue of his position within the enterprise." *Id.*; *see also United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc).

This court has noted the "numerous RICO criminal forfeiture cases which indicate that the nature of the RICO offense mandates joint and several liability." *Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989). We agree with a decision of a sister circuit that co-conspirators in a RICO enterprise should be held jointly and severally liable for any proceeds of the conspiracy:

> Codefendants are properly held jointly and severally liable for the proceeds of a RICO enterprise. . . . The government is not required to prove the specific portion of proceeds for which each defendant is responsible. Such a requirement would allow defendants "to mask the allocation of the proceeds to avoid forfeiting them altogether."

*United States v. Simmons*, 154 F.3d 765, 769-70 (8th Cir. 1998); *see also United States v. Caporale*, 806 F.2d 1487, 1507 (11th Cir. 1986) (stating that "joint and several liability is not only consistent with the statutory scheme [of RICO], but in some cases will be necessary to achieve the aims of the legislation"). Accordingly, we will apply the principles of joint and several liability to any forfeiture that we deem to be warranted.

### D. Sufficiency of evidence as to conspiratorial participation

The district court found that the evidence was insufficient to show that the defendants had actually "*obtained* anything sufficiently determinable in degree of value to allow the calculation of an amount of forfeiture." (Emphasis added). The court addressed the factual bases upon which the government sought forfeiture according to each category of illegal proceeds sought. We will follow that format and will discuss the involvement of each defendant as it relates to the particular category of proceeds.

#### i. Overview

A brief review of the conspiratorial enterprise is helpful in putting the other facts into context. Jack Tocco was alleged

impossible to make a rationally quantified finding of fact that the partners and associates in the Detroit partnership obtained anything sufficiently determinable in degree of value to allow the calculation of an amount for forfeiture.

The court then stated that it would "consider appropriate fines" at sentencing, but fines ultimately were imposed on only Anthony Corrado and Jack Tocco for $140,131 and $94,447, respectively, substantially less than any claimed forfeiture amount.

On appeal, the government contends that the district court's decision was erroneous because (1) the RICO forfeiture statute is mandatory and requires a court to order a forfeiture of sufficiently quantifiable assets; (2) all co-conspirators should be jointly and severally liable for the proceeds generated by the co-conspirators; and (3) the evidence was sufficient to hold all five defendants liable for the proceeds generated by the conspiracy. We review the district court's legal conclusions *de novo*, and will review the court's findings of fact for clear error. *See United States v. Charles*, 138 F.3d 257, 267 (6th Cir. 1998); *United States v. Williams*, 962 F.2d 1218 (6th Cir. 1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). We are mindful that § 1963(a)(3) is to be broadly interpreted to effectuate its remedial purpose. *See Russello v. United* States, 464 U.S. 16, 26-27 (1983); *DeFries*, 129 F.3d at 1315. Furthermore, as we have stated, the government must prove its right to forfeiture by a preponderance of the evidence.

### A. Paul Corrado, Nove Tocco, and Anthony Corrado

These three defendants appealed their convictions and sentences in separate proceedings before this court. *See (Paul) Corrado*, *supra*, and *(Anthony) Corrado*, *supra*. One of the allegations raised by all three defendants was that the district court inadequately questioned jurors regarding alleged

jury tampering. We held in *(Paul) Corrado* that "[t]he nature and scope of the investigation required when jury misconduct is credibly alleged was set forth by the Supreme Court in *Remmer v. United States*, 347 U.S. 227 (1954)." *(Paul) Corrado*, at *___. Because the district court did not conduct an adequate evidentiary hearing into the allegations of jury tampering, we remanded to the district court to investigate according to the standard set out in *Remmer. Id.* at ___. We remanded in the *(Anthony) Corrado* case under the same strictures, although Anthony Corrado failed to present specific objections during trial. *See (Anthony) Corrado*, at *___. Because the outcome of those remand proceedings could possibly result in a new trial and render these forfeiture issues moot, we will withhold our opinion as to Paul Corrado, Nove Tocco, and Anthony Corrado pending the outcome of the district court's proceedings. Consequently, as of the date of this opinion, the following analysis will be effective as to only defendants Jack Tocco and Vito Giacalone.

### B.  Mandatory nature of statute

RICO provides specifically that a defendant convicted of a violation of the Act "*shall* forfeit to the United States . . . any interest the person has acquired or maintained in violation of section 1962 [and] any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962." 18 U.S.C. § 1963(a)(1) & (3) (emphasis added). In light of the "shall forfeit" language, courts have held that the statute creates a mandatory obligation of forfeiture after a RICO conviction. *See United States v. Faulkner*, 17 F.3d 745, 774-75 (5th Cir. 1994) (holding that forfeiture is not discretionary; rather, jury instructions must follow the "shall forfeit" language of the statute); *United States v. Busher*, 817 F.2d 1409, 1413-14 (9th Cir. 1987) (determining that forfeiture is not limited to tainted assets of a RICO enterprise, but extend to the convicted person's entire interest in the enterprise). Though the statute appears to require total forfeiture of illegal proceeds, courts can reduce the forfeiture to make it proportional to the

seriousness of the offense so as not to violate the Eighth Amendment prohibition against "cruel and unusual punishment" or "excessive fines." *See United States v. Sarbello*, 985 F.2d 716, 717-18 (3d Cir. 1993) (holding that the mandatory statutory penalty may be reduced to conform to the Eighth Amendment).

We find that the "shall forfeit" language of the statute mandates that a district court assess forfeiture against the defendant when the facts support a finding of a sufficient nexus between the property to be forfeited and the RICO violation. *See DeFries*, 129 F.3d at 1313. "Only property 'acquired or maintained' through racketeering activity or 'derived from[ ] any proceeds . . . obtained, directly or indirectly from racketeering activity' is subject to forfeiture." *Id.* We believe that this finding is consistent with the plain language of the statute and with the punitive purpose of RICO. *See Russello*, 464 U.S. at 26-27 (stating that RICO should be broadly construed to effectuate its remedial purpose); *DeFries*, 129 F.3d at 1315 (emphasizing that RICO forfeiture is a punitive, not a restitutive, remedy).

### C.  Joint and several liability

Though it recognized that joint and several liability would ordinarily apply to the forfeiture of proceeds arising out of a RICO conspiracy, the district court did not hold the defendants jointly and severally liable because "the evidence does not support with sufficient quantification of value either the amounts of property at derivation or the movement of a quantified amount of property to a destination (or destinations)."[3] The district court, in fact, after discussing its interpretation of the meaning of the word "obtained" in § 1963(a)(3), referred to a "minimum required for an appropriate *joint and several* forfeiture judgment." (Emphasis added).

---

[3] Jack Tocco's counsel conceded in oral argument that the district court determined that joint and several liability might apply in this case if the evidence had supported the forfeiture.